[Cite as *San Allen, Inc. v. Buehrer*, 2014-Ohio-2071.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 99786**

---

## SAN ALLEN, INC., ET AL.

PLAINTIFFS-APPELLEES/
CROSS-APPELLANTS

vs.

## STEPHEN BUEHRER, ADMINISTRATOR, OHIO BUREAU OF WORKERS' COMPENSATION

DEFENDANT-APPELLANT/
CROSS-APPELLEE

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-07-644950 and CV-689611

**BEFORE:** Rocco, P.J., E.A. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** May 15, 2014

**ATTORNEYS FOR APPELLANT**

Michael DeWine
Attorney General of Ohio

BY: Mark E. Mastrangelo
Jeffrey B. Duber
Assistant Attorneys General
615 West Superior Ave., 11th Floor
Cleveland, Ohio 44113-1899

John N. Childs
Robert A. Hager
Adam D. Fuller
Brennan, Manna & Diamond, L.L.C.
75 E. Market St.
Akron, Ohio 44308

**ATTORNEYS FOR APPELLEES**

James A. DeRoche
Stuart I. Garson
David L. Meyerson
David H. Krause
Seaman Garson, L.L.C.
1600 Rockefeller Building
614 West Superior Ave.
Cleveland, Ohio 44113

Patrick J. Perotti
Jonathan T. Stender
Darrin R. Toney
Nicole T. Fiorelli
Dworken & Bernstein Co., L.P.A.
60 South Park Pl.
Painesville, Ohio 44077

**AMICI CURIAE**

**Attorneys for Ohio AFL-CIO**

Marc J. Jaffy
Stewart R. Jaffy
Stewart Jaffy & Assoc. Co., L.P.A.
306 East Gay St.
Columbus, Ohio 43215

**Attorneys for Ohio Chamber of Commerce and National Federation of Independent Business/Ohio**

John W. Zeiger
Stuart G. Parsell
Zeiger, Tigges & Little L.L.P.
41 South High St., Suite 3500
Columbus, Ohio 43215

**Attorney for Cleveland Teachers Union, AFT Local 279, AFL-CIO**

Susannah Muskovitz
Muskovitz & Lemmerbrock, L.L.C.
1621 Euclid Ave., Suite 1750
Cleveland, Ohio 44115

**Attorney for Teamsters Local Union No. 416**

Susan L. Gragel
Goldstein Gragel, L.L.C.
1040 Leader Building
526 Superior Ave.
Cleveland, Ohio 44114

**Attorney for International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local No. 17**

James A. Marniella
Demer & Marniella, L.L.C.
2 Berea Commons, Suite 200
Berea, Ohio 44017

**Attorneys for City of Cleveland**

Barbara A. Langhenry

Director of Law
City of Cleveland
By: Joseph F. Scott
Chief Assistant Director of Law
City of Cleveland - Law Department
601 Lakeside Ave., Room 106
Cleveland, Ohio   44114

Mitchell G. Blair
Maura L. Hughes
Calfee Halter & Griswold L.L.P.
1405 East 6th St.
Cleveland, Ohio 44114

**Attorney for The Council for Economic Opportunities in Greater Cleveland**

Terence E. Copeland
The Council for Economic Opportunities in Greater Cleveland
1228 Euclid Ave., Suite 700
Cleveland, Ohio 44115

KENNETH A. ROCCO, P.J.:

**{¶1}** Reduced to its irreducible essence, this appeal is about a cabal of Ohio Bureau of Workers' Compensation ("BWC") bureaucrats and lobbyists for group sponsors who rigged workers' compensation insurance premium rates so that for employers who participated in the BWC's group rating plan ("group-rated employers"), it was "heads we win," and for employers who did not participate in the group rating plan ("nongroup-rated employers"), it was "tails you lose." For more than 15 years, the BWC allowed nongroup-rated employers to subsidize excessive, undeserved premium discounts to group-rated employers who were handpicked by group sponsors to participate in the BWC's group rating plan. The temerity of the group sponsors, untempered by any notions of equity from or of the BWC, exacted a heavy price for nongroup-rated employers — over $859 million.

**{¶2}** The trial court correctly determined that the BWC was responsible for developing and maintaining an unlawful rating system under which excessive premium discounts were given to group-rated employers at the expense of nongroup-rated employers. The BWC first failed to follow a legislative mandate to establish a retrospective group rating plan, then set up a prospective group rating plan without sufficient controls to address the plan's susceptibility to manipulation by group sponsors and the potential for premium inequity as a result of the generous discounts provided to group-rated employers under the plan.

**{¶3}** Defendant-appellant/cross-appellee Stephen Buehrer, Administrator, BWC, appeals the judgment of the Cuyahoga County Court of Common Pleas that awarded over

$859 million in equitable restitution to a class of employers who alleged that they had been unlawfully charged inflated workers' compensation insurance premiums in order to subsidize discounts given to other employers participating in the BWC's group rating plan. Plaintiffs alleged that until 2009, when the BWC modified its premium rating system, the BWC "undercharged," from an actuarial standpoint, group-rated employers and "overcharged," from an actuarial standpoint, nongroup-rated employers in setting workers' compensation premiums. The trial court held that the BWC's implementation of its group rating plan and the resulting inequity between the premiums charged group-rated and nongroup-rated employers under its rating system violated former R.C. 4123.29 and 4123.34(C). The trial court further held that the BWC was unjustly enriched by the excessive premiums it received from nongroup-rated employers, entitling class members to equitable restitution of the unlawful premium overcharges.

{¶4} Plaintiffs-appellees/cross-appellants San Allen, Inc., d.b.a. Corky and Lenny's, Timely Advertising Specialty Co., d.b.a. S.E. Bennett Company, Linderme Tube Co., Cambridge Manufacturing Jewelers, Ltd., D&J Structural Contracting, Inc., Lifecenter Plus, Inc., and David W. Steinbach, Inc. ("plaintiffs") have filed a cross appeal, challenging the trial court's determination that the BWC's premium rating system did not violate the Equal Protection Clause of the Ohio Constitution and claiming that the trial court abused its discretion in failing to award plaintiffs an additional $330 million (or more) in investment returns the BWC allegedly earned on the excessive premiums collected from the class.

**{¶5}** For the reasons that follow, we affirm the trial court's judgment in part, reverse the trial court's judgment in part, and remand the matter for further proceedings consistent with this opinion.[1]

## I. Factual Background

### A. This Action

#### 1. Plaintiffs' Allegations

**{¶6}** This action was commenced on December 18, 2007, when plaintiffs-appellees San Allen, Inc., d.b.a. Corky and Lenny's, Timely Advertising Specialty Co., d.b.a. S.E. Bennett Company, and Linderme Tube Co. filed their original "class action complaint for equitable relief" against the BWC. On January 31, 2008, an amended complaint was filed, adding as additional named plaintiffs, Cambridge Manufacturing Jewelers, Ltd., D&J Structural Contracting, Inc., Lifecenter Plus, Inc., and David W. Steinbach, Inc.

**{¶7}** In their amended complaint, plaintiffs asserted "a claim in equity for unjust enrichment" on behalf of themselves and similarly-situated employers who had paid nongroup-rated premiums for workers' compensation insurance coverage, raising statutory and constitutional challenges to the BWC's group rating plan. Plaintiffs alleged that the BWC's group rating plan granted group-rated employers excessive discounts off their workers' compensation premiums, which were subsidized by charging

---

[1] We acknowledge that this opinion is lengthy. The trial court in this case authored a thorough and comprehensive, if not masterful, opinion. As such, we believe it is deserving of an equally thorough and comprehensive review on appeal.

nongroup-rated employers "inflated" base premium rates. Plaintiffs claimed the BWC's prospective group rating plan exceeded the BWC's rule-making authority under former R.C. 4123.29 (which plaintiffs contended authorized only a retrospective group rating plan) and that it denied plaintiffs and other class members equal protection of the law, in violation of Article I, Section 2 of the Ohio Constitution, because it imposed burdens on nongroup-rated employers in the plaintiff class that were not borne by identically situated group-rated employers.[2] Plaintiffs also claimed that, as a result of its collection and retention of excessive premiums from plaintiffs and other class members, the BWC had been unjustly enriched. Plaintiffs sought (1) a declaration that the BWC's group rating program violated state law and was unconstitutional, (2) repayment of the excessive premiums they alleged had been wrongfully collected and retained by the BWC, and (3) an award of pre-judgment and post-judgment interest, costs, and attorney fees.

## 2.     The BWC's Answer

{¶8}   On February 28, 2008, the BWC filed its answer. The BWC denied most of the allegations of plaintiffs' amended complaint, but admitted that the group rating plan affected the base rates of nongroup-rated employers and that studies had been conducted that showed that the group discounts provided to group-rated employers did not generate adequate premiums to cover the claims costs of group-rated employers. The

---

[2] Plaintiffs also alleged in their amended complaint that the BWC's group rating plan violated Article II, Section 35 of the Ohio Constitution by apportioning workers' compensation premiums differently to identically-situated employers, based on their group membership or nongroup membership, instead of their occupational classification. Plaintiffs appear to have abandoned this argument.

BWC also asserted a variety of affirmative defenses, including lack of subject matter jurisdiction, failure to exhaust administrative remedies, lack of ripeness, laches, and that plaintiffs' claims were barred by the applicable statute of limitations.

### 3. Preliminary Injunction

{¶9} On April 11, 2008, plaintiffs filed a motion for preliminary injunction, seeking to enjoin the BWC from continuing its allegedly inequitable and unlawful group rating plan. Concluding that plaintiffs had established a probability of success on the merits that the group rating plan violated former R.C. 4123.29(A) and that plaintiffs would suffer irreparable harm if preliminary relief was not granted, on November 18, 2008, the trial court granted plaintiffs' motion, restraining the BWC from using its prospective group rating plan for the policy year beginning July 1, 2009 and ordering the BWC to enact a retrospective group rating plan for that year. *San Allen, Inc. v. Ryan*, Cuyahoga C.P. No. CV-07-644950, 2008 Ohio Misc. LEXIS 333 (Nov. 18, 2008). Four months later, after the General Assembly rewrote the statute to remove the language upon which plaintiffs had relied for their argument that R.C. 4123.29(A) required a retrospective group rating plan, rather than the prospective group rating plan implemented by the BWC, the trial court vacated the preliminary injunction.[3]

_____

[3] Effective January 6, 2009, the General Assembly amended R.C. 4123.29(A)(4)(c), substituting the word "group" for the word "retrospective" in the first sentence of R.C. 4123.29(A)(4)(c). As amended, the statute provided, in pertinent part: "In providing employer group plans under division (A)(4) of this section, the administrator shall consider an employer group as a single employing entity for purposes of *group* rating." (Emphasis added.) Before the amendment, this section of the statute stated: "In providing employer group plans under division (A)(4) of this section, the administrator shall consider an employer group as a single employing entity for purposes

{¶10} On January 10, 2010, the trial court granted plaintiffs' motion for class certification, certifying the following plaintiff class:

> Ohio private employers subscribing to the Ohio workers' compensation State Fund, for any policy year from July 1, 2001 through and including policy year July 1, 2008, who in any of those policy years were rated on a non-group basis and who reported payroll and paid premiums in a manual classification for which the base rate was "inflated" due to experience modifications under the group experience rating plan.

{¶11} The BWC appealed the class certification order. This court affirmed class certification on April 7, 2011. *San Allen, Inc. v. Buehrer*, 8th Dist. Cuyahoga No. 94651, 2011-Ohio-1676.

### B. The Trial

{¶12} A bench trial commenced on August 20, 2012. Prior to trial, the BWC moved in limine to exclude the declarations and testimony of plaintiffs' expert Allan Schwartz under Evid.R. 702, *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735 (1998), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.E.2d 469 (1993). The BWC also moved to decertify the class on the grounds that certain members of the plaintiff class had suffered no harm, that individual issues predominated over common issues, and that the class was a "fail-safe class." The trial court denied both motions.

{¶13} During the trial, the trial court heard testimony from more than a dozen witnesses, including current and former representatives of the BWC, several of the named

---

of *retrospective* rating." (Emphasis added.)

plaintiffs, and various experts, and reviewed thousands of pages of exhibits.[4] The following summary is based on the testimony and evidence presented.

### 1. Rate Setting by the BWC

### a. The BWC's Rate-Setting Authority

{¶14} The administrator of the BWC is charged, by statute, with managing Ohio's workers' compensation system and, with the approval of its board of directors, setting the premiums employers pay into the state insurance trust fund for workers' compensation coverage. The BWC is granted considerable discretion in setting premium rates, provided it complies with statutory mandates and workers' compensation insurance principles.

{¶15} R.C. 4123.29 and 4123.34 set forth the BWC's statutory rate-setting obligations. These obligations include: "[c]lassify[ing] occupations or industries with respect to their degree of hazard and determin[ing] the risks of the different classes," "[f]ix[ing] the rates of premium of the risks of the classes," "set[ting] * * * rates at a level that assures the solvency of the [state insurance] fund," and the development of "fixed and equitable rules controlling the rating system, which rules shall conserve to each risk the basic principles of workers' compensation insurance."

---

[4] This was in addition to the testimony and exhibits the parties previously offered into evidence at the preliminary injunction hearing, held in August 2008. The evidence at the preliminary injunction hearing included testimony from several of the named plaintiffs, several representatives of the BWC, and various group sponsors and lobbyists.

## b.     The BWC's Rate-Setting Process

{¶16} The BWC's rate-setting process is complex.   Numerous assumptions, factors, and calculations go into setting annual premium rates.   The final premium paid by an employer typically involves a number of price adjustments and may also include pre- or post-policy year discounts, rebates, or dividends that reduce the employer's total premium.   Because we believe a general understanding of this process is helpful to our review of the issues in this case, we provide a brief overview here.

{¶17} As Christopher Carlson ("Carlson"), the BWC's chief actuarial officer, and other BWC representatives testified, the BWC is designed to operate on a "revenue-neutral" basis.   This means that the BWC seeks to collect from employers participating in Ohio's workers' compensation insurance program only the amount of premiums necessary to cover the BWC's projected claims costs and administrative expenses and to maintain a reasonable surplus in the state insurance trust fund.   Rates are determined each year on a "top-down" basis.   That is, each year the BWC estimates the costs of claims and expenses expected to be incurred in the upcoming policy year.   This estimate considers all of the losses of employers insured through the workers' compensation system over the last ten years and uses those losses to predict future costs. Based on this estimate, the BWC's current net asset position, and the general economic climate (including investment income expected to be earned on premiums received), the BWC determines its overall revenue needs for the year, and, with the assistance of

actuaries, sets a statewide rate. The BWC then allocates the total premiums it needs to collect among the employers participating in the workers' compensation system.

{¶18} Under Ohio's workers' compensation program, employers can be "base rated" or "experience rated." Employers are classified into one or more of more than 500 different occupational classifications ("manual classes") based on the type of work in which their employees are engaged, i.e., their "occupations or industries," and the "degree of hazard" associated with the work. For each manual class, the BWC performs calculations based on historical data to come up with the projected value of losses for the class in relation to payroll, which is then adjusted for catastrophic losses and certain other items. The BWC assigns each manual class a base premium rate that is revised annually based on the combined accident and occupational experience of the employers in each manual class during the oldest four of the last five calendar years. This figure is then adjusted by an "off-balance factor"[5] assigned by the BWC to generate a base premium rate for the class ("base rate").

{¶19} After base rates are set, the BWC applies merit or "experience rating." If an employer has sufficient claims experience, the employer may qualify for individual

---

[5] The off-balance factor is a factor that is applied at the manual class level in determining base rates. The off-balance factor is used to offset a premium shortfall or overage condition in the overall level of premiums collected from employers due to experience rating (including both individual experience rating and group rating) and discounts or rebates given to employers participating in the BWC's discount programs. Even if there had been no group rating, use of an off-balance factor would still be necessary to account for discounts given as a result of individual experience rating and the BWC's other discount programs.

experience rating. Under experience rating, an employer's past claims experience, adjusted by a credibility factor based on the statistical reliability of the employer's experience,[6] is used to determine the employer's premium. In the experience rating process, the base rate may be adjusted up or down by applying an "experience modification factor." If an employer's past claims experience is better than average, an employer may be charged a lower premium rate; if an employer's past claims experience is worse than average, the employer may be charged a higher premium. Costs factors are then added to the base rate or the experience-modified base rate, as applicable, to cover administrative costs and the costs of paying cost-of-living increases to permanently and totally disabled workers. The total of the premiums assessed for each manual class to which the employer is assigned, less any rebates or discounts the employer receives based on its participation in various programs offered by the BWC,[7] is the employer's total workers' compensation premium.

## 2. The BWC's Group Rating Plan

---

[6] Generally, the larger the employer (in terms of payroll and loss experience), the greater the credibility accorded the employer's past claims experience. Under group experience rating, discussed in the following section, credibility is assigned based on the combined payroll and expected losses of the members of the group. In most cases, the result is a higher credibility factor (and larger premium discount) than if group members were individually rated on their individual experiences.

[7] During the class period, the BWC offered a number of programs under which qualifying employers could receive post-policy period refunds of a portion of their premium payments if they met certain performance measures, for example, a drug-free workplace program and a safety council incentive program.

{¶20} In 1989, the General Assembly amended R.C. 4123.29 to require the BWC to develop and implement a plan "that groups for rating purposes, employers, and pools the risk of the employers within the group." Am.Sub.H.B. No. 222.

{¶21} In response to this mandate, the BWC established a group rating plan for the policy year beginning July 1, 1991. *See* Ohio Adm.Code 4123-17-61-4123-17-68. Although, as amended, R.C. 4123.29(A)(4) stated that "[i]n providing employer group plans * * * , the administrator shall consider an employer group as a single employing entity for purposes of retrospective rating,"[8] the BWC implemented only a prospective group rating plan.[9] Under a *prospective* rating plan, premium rates are based on past

---

[8]According to Preston Garvin, a lobbyist for the Ohio Chamber of Commerce, who was involved in the negotiation of H.B. 222 and who testified on behalf of the BWC at the preliminary injunction hearing, H.B. 222 was an "agreed to workers' compensation bill," i.e., the result of negotiations between representatives of the employer community (including the Ohio Chamber of Commerce, the Ohio Self-Insured Association, and the Ohio Manufacturers' Association) and representatives of the labor community (including the AFL-CIO and other unions). He testified that the legislation was intended to "get small employers in the game" and to "provide them with [an] incentive" to become "involved and concerned about their workers' compensation claims." He did not recall any discussions relating to retrospective group rating during the negotiations and testified that he was "surprised" when he later learned that, as enacted by the General Assembly, R.C. 4123.29(A)(4)(c) required that "in providing employer group plans * * * the administrator shall consider an employer group as a single employing entity for purposes of *retrospective* rating." (Emphasis added.)

[9]Following the 1989 amendments to R.C. 4123.29, the BWC adopted Ohio Adm.Code 4123-17-61, setting forth the criteria for "group experience rating." Ohio Adm.Code 4123-17-61 was patterned after the language of R.C. 4123.29 with one exception: it substituted the word "group" for the word "retrospective" used in R.C. 4123.29. Ohio Adm.Code 4123-17-61(C) stated, in relevant part: "In providing employer group plans under section 4123.29 of the Revised Code, the bureau shall consider an employer group as a single employing entity for purposes of *group* rating." (Emphasis added.)

claims experience, with premium discounts provided to those insureds with favorable past claims experience. Under a *retrospective* rating plan, the employer (or, in the case of a group plan, the group of employers) assumes some of the risk of actual losses during the policy period, and the total premium is determined after the policy period has ended, based on losses that have actually occurred during the policy period. In consideration for sharing the risk of losses that may actually be incurred during the policy period, the employer (or group) pays a lower up front premium. At the end of the policy period, the premium is adjusted retrospectively, based on the actual losses incurred by the employer (or group). If actual losses were higher than expected, the employer (or group) may pay a surcharge; if actual losses were lower than expected, the employer (or group) may receive a credit. During the class period, 2001-2008, the BWC offered only a prospective group rating plan. The BWC did not offer a retrospective group rating plan until 2009.

{¶22} Before group rating, employers could qualify for experience rating only on an individual basis. Group experience rating allowed employers to group together their claims history and receive experience-related premium discounts similar to larger employers. Group rating thus enabled employers with good safety records, but who were statistically too small to be individually experience-rated (i.e., too small qualify for experience modification of their base premium rates based on their own claims experience) and who would otherwise be base rated or experience rated with minimal credibility, to group together with other employers to qualify for experience rating. By

combining the experience of all of the members of the group, totaling it up, and treating the group as a single employer for rating purposes, the group could qualify for significant premium discounts based on their combined claims experience.

{¶23} Group rating was believed to provide employers with an incentive to improve safety and control claims costs because it was anticipated that group members with good safety records would not allow employers with poor safety records to join or remain in the group or would pressure those employers to improve their safety records to avoid an adverse effect on the group's rating. Because of the substantial discounts employers received under the BWC's group rating system, it was very popular. Employers participating in the BWC's group rating plan could qualify for discounts off their base rates as high as 90%. A representative of one group sponsor, Phillip Parker, president and CEO of the Dayton area Chamber of Commerce ("Parker"), testified that 800 of its member businesses saved $12 million annually from group rating. He testified that the discounts from group rating were so significant that, in order to get into a group or to retain their group status, certain members of his organization would just pay the wages of an injured employee while he or she was off work rather than report a claim to keep the claim off the employer's experience for rating purposes.

{¶24} Because the BWC operates on a revenue-neutral basis, the loss in premiums resulting from the significant discounts provided to employers under the BWC's group rating plan had to be redistributed. In other words, the premium obligations for nongroup-rated employers needed to be increased in order to offset the substantial

discounts provided to employers participating in the group rating program. As Carlson and Elizabeth Bravender ("Bravender"), director of the BWC's actuarial department, testified, this was achieved by increasing the off-balance factor used in calculating the base rates for the manual classes. Increasing the off-balance factor increased the base rate for all employers. Employers who were not part of a group (and did not receive the significant discounts off base rates that group members received) thus, in effect, paid "extra premiums" to make up for the discounts granted to group-rated employers under the BWC's group rating program.[10]

{¶25} A number of the employers in the plaintiff class, including several of the named plaintiffs, "migrated" between group rating and nongroup rating during the class period. For example, an employer in the plaintiff class might have been group rated from 2001-2005, then nongroup rated from 2006-2008. Of the approximately 302,000 employers in the plaintiff class, 89,439 employers were, at times, group rated and, at other times, nongroup rated during the class period. The remaining class members, approximately 213,000 employers, were nongroup rated during the entire class period. During the policy years in which class members were group rated, they, like other group-rated employers, benefitted from the significant discounts group-rated employers

_____

[10] As an example of the disparity in premiums that resulted from the BWC's group rating plan, in a 2007 presentation, John Pedrick, who was then the BWC's chief actuary, compared the premiums paid by two carpenters under the BWC's rating system, both of which had total payroll of $500,000 and zero claims. Carpenter A, a new, nongroup-rated employer, paid $48,050 in annual workers' compensation premiums, and carpenter B, a group-rated employer receiving the maximum group discount, paid $4,805 in annual workers' compensation premiums.

received under the BWC's rating system. During the policy years in which those class members were not group rated, they, like other nongroup-rated employers, were charged "extra premiums" in excess of the risk they presented to the workers' compensation system.

{¶26} The problem with the BWC's group rating plan stemmed from the way in which groups were formed and the manner in which employers' experience was accounted for under the plan. Group membership was determined on an annual basis, and groups were permitted to change their member employers in each policy period. The BWC gave group sponsors the right to control who was invited into a group and who was kicked out of a group. Unlike individual experience rating, in which an individual employer's experience rating would be affected by a claim for five years,[11] an employer's experience affected the experience rating of the group only so long as the employer was a member of the group. *See* Ohio Adm.Code 4123-17-65 ("[I]f an individual employer is a member of a group for group experience rating and leaves the group, the experience of that individual employer shall be used in experience-rating calculations for the group to impact only the rating years that the employer was a member of the group. * * * The group shall not be liable for claims experience incurred by an individual employer for claims occurring after the employer has left the group."). In other words, there was no shared risk among the employers in a group under the BWC's group rating plan.

---

[11]When experience rating an individual employer, the BWC considers the employer's individual loss experience during the oldest four of the latest five calendar years. *See* Ohio Adm.Code 4123-17-03(A)(1).

**{¶27}** If an employer who was group rated had a claim during the policy period, the group could avoid any adverse effect from that claim simply by excluding the employer from the group the following policy year. If an employer was kicked out of a group, its experience was no longer considered in rating the group. Because the experience period used to determine the discounts granted group-rated employers under the BWC's group rating plan related to a time period before the group was even formed, group sponsors could hand pick employers for groups to ensure the maximum discounts for its group members each year. John Pedrick ("Pedrick"), the BWC's former chief actuary, testified that group sponsors would target an experience modifier, then design the membership of the group to achieve that modifier. As one consultant described it, the BWC's group rating plan was like "having a fantasy league where the players are chosen after the season has ended."

**{¶28}** Pedrick testified that this "adverse selection" or "cherry picking" of employers for group membership resulted in a significant understatement of the risk presented by the employers remaining in the group. Group-rated employers did not have the level of credibility that was being assigned to them under the BWC's group rating program. As a result, group-rated employers were being undercharged premiums compared with the risk such employers presented to the workers' compensation system, and nongroup-rated employers were paying more than their fair share of premiums, subsidizing the discounts provided to group-rated employers through inflated base rates.

### 3. Actuarial Consultants Evaluate the Group Rating Plan

{¶29} That nongroup-rated employers were subsidizing the large discounts the BWC provided to group-rated employers under its group rating plan should have come as no surprise to the BWC. The record reflects that even before the BWC's prospective group rating plan went into effect, concerns were raised by the BWC's actuarial consultants regarding the plan's susceptibility to manipulation and the potential for premium inequity between group-rated and nongroup-rated employers as a result of the generous premium discounts provided to group-rated employers under the plan. In a 1990 report, actuary Robert Finger warned that the merit rating process and base rates could be subject to manipulation by group rating and that this "would increase the off-balance and the base rates; consequently, those employers not in the group would pay more than they should." A 1991 report similarly warned that the "potential for manipulation" under the BWC's proposed prospective group rating plan was "considerable" and could cause "increases in base rates, which cause rate increases for employers who are not members of a group."

{¶30} Equity concerns continued to be raised once the group rating plan was underway and throughout the class period. Beginning in October 1993 and continuing through 2007, the BWC commissioned seven additional independent actuarial studies (in 1993, 1994, 1995, 2001, 2004, 2006, 2007) to evaluate the BWC's rating program. Each of these studies concluded that, as a result of the large discounts given to group-rated employers, the BWC's group rating plan was creating substantial premium inequity between group-rated and nongroup-rated employers, i.e., group-rated employers were not

paying enough premiums to cover the risk they presented, and nongroup-rated employers were paying too much in premiums, subsidizing the discounts given to the group-rated employers. Each of these studies also recommended that changes be made to the group rating plan to correct this inequity. In October 1993, for example, the BWC's actuarial consultant recommended that premiums for group-rated employers be increased and that base rates and premiums for nongroup-rated employers be reduced "in order to restore equity to the experience rating process." In 1994, the BWC's actuarial consultant reported that nongroup-rated employers had at that time subsidized group-rated employers by approximately $128 million and that similar subsidies were expected for subsequent rating periods if the current group rating approach was continued. The BWC received similar reports from its consultants in 1995 and 2001, each calling attention to the premium overcharges of nongroup-rated employers resulting from the BWC's group rating plan and recommending that the plan be fixed or discontinued.

{¶31} In August 2004, the BWC asked its actuarial consultant to consider whether its group rating plan was "fair." The consultant advised the BWC that the loss ratios (i.e., losses divided by premiums) for group-rated employers were "noticeably higher" than for nongroup-rated employers under the BWC's rating system and that "even though group rating may have resulted in an overall reduction in losses for the fund, group rated employers have enjoyed higher credits than can be supported by their actual losses." In a June 2007 report to the Ohio Workers' Compensation Oversight Commission, another actuarial consultant similarly reported that "group rating has had a

significant adverse effect on pricing equity — prices for various groups are not reflective of underlying costs" and that "there exists substantial cross-subsidization,"[12] resulting in the payment of "exorbitantly high base rates" by nongroup-rated employers. The consultant recommended that "[g]iven its current unfairness, the Group Rating Plan should not continue in its current form." As he explained:

> While the general concept of group rating has merit, the program as it currently exists does not produce rates that are actuarially sound (reasonable and not excessive, inadequate, or unfairly discriminatory). Group rated companies consistently produce loss ratios well in excess of non-group rated companies, indicating that non-group rated companies are subsidizing the group rated companies.

{¶32} In November 2006, a task force led by the Ohio Inspector General opened an investigation into the methodology used by the BWC in calculating premium rates. In its August 2007 report, the task force concluded that the BWC had committed an "act of omission" in failing to follow the recommendations of its actuarial consultants with regard to the "huge premium discounts" the BWC had given group-rated employers under its group rating plan.

---

[12] Cross-subsidies occur when rating classifications or processes result in premium levels for one segment of insureds that are relatively greater than the insureds' expected claims and expenses and premiums for another segment of insureds that are relatively lower than their expected claims and expenses.

**{¶33}** In 2007, the General Assembly enacted H.B. 100, which called for an independent "comprehensive review" of the base premium rates paid by employers and "all of the [BWC's] rating programs." 2007 Am.Sub.H.B. 100. In its 2009 report, Deloitte Consulting L.L.P., the consultant engaged to perform this review, concluded that the "pricing structure" under the BWC's rating system "has created substantial inequity in the premiums paid by different employers," that the "primary driver of this inequity is the [BWC's] current approach to group rating," and that the "performance results of the group rating program indicate a substantial lack of actuarial soundness with respect to equitable rating." It further stated: "We are unaware of any other state that has a program which functions as poorly as the existing group rating program does in Ohio."

### 4. The BWC Acknowledges Problems with the Group Rating Plan

**{¶34}** The record reflects that BWC representatives acknowledged the premium inequity resulting from its group rating plan both publicly and privately, but, for many years, did little or nothing to correct it. Base rates continued to rise, and nongroup-rated employers continued to subsidize the excessive discounts given to group-rated employers throughout the class period. In October 1993, then-BWC administrator Wes Trimble reported in a memorandum to the BWC board of directors that for the rating year beginning July 1, 1993, the "shift in premium payment caused by the group rating plan increased the base rates by an average of 13.1%," resulting in a $222,320,437 increase in premiums to nongroup-rated employers "to offset the discounts given to group employers." Bravender testified that the BWC knew by at least 2001 that

nongroup-rated employers were paying more in premiums than they should have been paying. Tracy Valentino, the BWC's chief fiscal and planning officer, similarly confirmed that from 2004 to 2008, the BWC knew that it was "shifting premium burden" from group-rated employers to nongroup-rated employers under the rating system then in effect.

{¶35} In a 2007 Powerpoint presentation, Pedrick, who was then the chief actuarial officer of the BWC, expressly acknowledged that nongroup-rated employers were "being hurt" by the BWC's group rating system. He advised that nongroup-rated employers were paying an average subsidy of $1,251, totalling over $200 million annually, "to cover claims costs incurred by group-rated employers." Employers who were "eliminated from group rating" experienced an average premium increase of $8,600. In a consumer advisory issued to employers in the fall of 2007, then-BWC administrator Marsha Ryan reported that "[t]he premium inequity caused by the Ohio group-rating program inflates base rates" and that actuarial "studies have determined that current group discounts do not generate adequate premiums to cover claims costs for group employers." In February 2009, she acknowledged that under the BWC's group rating plan, "[s]imilarly situated employers were paying different premiums for the same product — some far less than what their risk represents to the system, others more than their fair share." Later that year, she informed the Ohio Senate Insurance Committee that "[a]ctuarial data indicates that group rated employers bring higher costs to the system

than they pay" and that "employers who were not in a group paid extra premium to make up the shortfall left as an effect of the large group discount."

{¶36} Efforts by the BWC to correct the premium inequity resulting from its group rating program met with sharp resistance from the group sponsors. As a representative from one group sponsor, Parker, testified, "we want the maximum discounts available * * * to provide the lowest cost to our members." "[A]nything reducing that"— even to correct inequity in the rating system for nongroup-rated employers — "is incorrect, is a flaw * * * head[ing] back to * * * that slippery slope we once were in in Ohio where workers' compensation was going to be * * * the silent killer of jobs in Ohio." In other words, the premium inequity resulting from the BWC's group rating plan was simply not a concern for many group sponsors:

> Q.  Now, do you believe that every employer in the State of Ohio has a right to be charged a fair premium, a fair premium that's based on the risk that that employer brings to the system?
>
> A.  I believe that there are certain programs like group rating that allows us to maximize the discounts. And that's why I'm here. That's the opinion I have and that's why I'm here.
>
> Q.  So I will take that as a no?
>
> A.  If you want to.

{¶37} Although at various points throughout the class period, the BWC undertook certain steps to reduce premium costs,[13] it was not until the policy year

---

[13]The BWC presented evidence that at various points throughout the class period, it took steps to reduce overall premium rates (i.e., reducing premium costs for both group-rated and nongroup-rated employers), including the issuance of dividends, lowering claims reserves, and the introduction of

beginning July 1, 2009, that the BWC began making significant changes to its rating system to set more accurate (and equitable) premium rates for group-rated and nongroup-rated employers. Instead of calculating separate off-balance factors for each manual class, for the policy year beginning July 1, 2009, the BWC applied a constant off-balance factor of 1.23 in setting rates for all manual classes, lowering the off-balance factor for any class that had previously had an off-balance factor greater than 1.23 and raising the off-balance factor for any class that had previously had an off-balance factor less than 1.23. Pedrick testified that this method of calculating rates set "more accurate rates" for nongroup-rated employers "than the prior system" and that if the 1.23 off-balance factor implemented in 2009 had been used to recalculate premium rates in prior years, it would have resulted in a "more accurate rate" for nongroup-rated employers then as well. The BWC made other changes to its rating system in 2009 as well, including applying a "break-even factor" to group-rated employers that had the effect of lowering the effective maximum discount received by nongroup employers. As a result of these and other continuing changes to the BWC's rating plans, the premium inequity problems with the BWC's group rating system were, by all accounts, slowly resolved.

---

new safety programs under which employers could qualify for premium discounts or rebates. The BWC also presented evidence of several measures it implemented that were designed to provide premium relief specifically to nongroup-rated employers. For example, from 2002-2006, the BWC applied a nongroup discount factor to premium rates of nongroup-rated employers and, beginning in 2005, the BWC began reducing the maximum discount group-rated employers could receive under the group rating program, thereby reducing the base rates and subsidy paid by nongroup-rated employers. Even as a result of these efforts, however, the record reflects that substantial premium inequity between group-rated and nongroup-rated employers continued.

### 5. The Experts

#### a. Plaintiffs' Expert Allan Schwartz

**{¶38}** Plaintiffs retained actuarial expert Allan Schwartz ("Schwartz") to support their claim for equitable restitution. Schwartz opined that, based on actuarial principles of rate-making, i.e., guidelines used by insurance companies to set actuarially sound rates, the rates the BWC charged group-rated and nongroup-rated employers during the class period "were not actuarially sound" and that the BWC's rating system was "unfairly discriminatory" and "actuarially inequitable" because nongroup-rated employers were charged a rate that was higher than the expected value of future costs associated with the risk they presented, and group-rated employers were charged a rate that was lower than the expected value of future costs associated with the risk they presented.

**{¶39}** Schwartz developed a formula to determine the amount by which the BWC had overcharged nongroup-rated employers during 2001-2008 (the "Schwartz formula"). Under his formula, restitution was calculated on annual basis, based on whether, during a given year or policy period, a class member was nongroup-rated in any manual classes that included both group-rated and nongroup-rated employers and to which an off-balance factor of 1.23 or greater had been applied in calculating base premium rates. Schwartz opined that this formula produced "[a] reasonable value for the premium overcharge to a reasonable degree of actuarial certainty."

#### i. The Schwartz Formula

**{¶40}** Schwartz used a five-step process to calculate the restitution plaintiffs claimed was owed the plaintiff class. First, an overcharge factor was calculated for each of the "inflated" manual classes by comparing the base rate the BWC actually charged nongroup-rated employers to a "corrected base rate" calculated by Schwartz, i.e., the rate that should have been charged. To calculate the corrected base rate, the off-balance factors the BWC had actually used in calculating rates for the relevant manual classes during the class period were replaced with a "corrected" off-balance factor of 1.23 — the uniform off-balance factor the BWC applied in policy year 2009 when attempting to charge more accurate rates to nongroup-rated employers.[14]

**{¶41}** Second, the overcharge factors calculated in step one were applied to the premiums charged nongroup-rated employers, by manual class, to determine the amount of the overcharge. Schwartz excluded from his restitution calculation (1) manual classes in which there were no group-rated employers[15] and (2) manual classes in which the off-balance factor applied by the BWC during the class period was less than 1.23.[16] The

_____

[14] The BWC criticizes Schwartz's use of a single, constant off-balance factor in calculating his "corrected" base rates, in part because the BWC used different off-balance factors for each manual class during the class period. Schwartz claimed that if he applied different off-balance factors to each manual class, it "would shift the amount of damages between classes, but it wouldn't make a difference in the overall issue that there were damages[.] * * * [T]he difference would be in terms of different classes, how much you would say one was inflated relative to the other."

[15] Schwartz excluded manual classes in which there were no group-rated employers from his restitution calculation, reasoning that if a manual class did not have any group-rated employers, the base rate for that class could not have been inflated by the BWC's group rating plan.

[16] Whereas the BWC applied a 1.23 off-balance factor to all manual classes,

overcharge factor was applied to the net premium charged the employer after deducting dividends and other upfront discounts. Also included in Schwartz's restitution calculation were the amounts the BWC charged employers for administrative costs and certain contributions to the disabled workers relief fund, which were also affected by the inflated base rates.

{¶42} Third, the premium overcharges in each manual class were totaled by policy number. In step four, adjustments were made to the restitution amount calculated for each employer to account for any post-policy period discounts or rebates the employer received. Finally, in step five, investment returns allegedly earned by the BWC on the premium overcharges were calculated to determine the total restitution allegedly owed to the plaintiff class.

{¶43} Because the BWC calculated and collected premiums on an annual basis, Schwartz likewise calculated restitution on an annual basis. If, in a given policy year, an employer was nongroup rated in a manual class that included both group-rated and nongroup-rated employers and had an off-balance factor of 1.23 or higher, he included

lowering the off-balance factor for any class that was above 1.23 and raising the off-balance factor for any class that had an off-balance factor less than 1.23, when it modified its rating program in 2009, Schwartz used a zero restitution value for manual classes in which the off-balance factor was less than 1.23. According to Schwartz, because it had been established, based on testimony by Carlson and others, that the manual classes that included group-rated employers had inflated base rates during the class period, the fact that application of a uniform 1.23 off-balance factor resulted in negative numbers for some classes did not mean those employers had been "undercharged" during the class period; it simply meant that his formula did not capture all of the premium overcharges of nongroup-rated employers in the plaintiff class.

the premium overcharge for that employer for that policy year in his restitution calculation. [17] No offset was provided under the Schwartz formula for any cross-subsidies class members received during the years they were group rated; Schwartz testified that he had no opinion regarding the migration of class members in and out of groups.

**b. The BWC's Expert Richard Conger**

**{¶44}** Robert Conger, an actuarial consultant with Towers Watson, testified on behalf of the BWC. Both Conger's methodology and conclusions differed significantly from those of Schwartz. Conger proposed an alternative means of evaluating the equity of the BWC's group rating plan using a "net income analysis." Under his net income analysis, Conger compared the premiums class members paid to the BWC against the claim costs, expenses, mandatory assessments, and "benefits," i.e., dividends and "cross-subsidy benefits," received by the class in the aggregate. The two most significant differences between Conger's and Schwartz's methodologies involved (1) Conger's recognition of cross-subsidy benefits and (2) the treatment of dividends class members received from the BWC in 2001-2004.

**{¶45}** Conger, as part of his analysis, included a deduction from the restitution amount for a "cross-subsidy benefit" class members who were group rated during part of the class period received during the years in which they were group rated. Conger described this "cross-subsidy benefit" as follows:

---

[17]The trial court did not adopt step five of the Schwartz formula. *See infra* at ¶ 48.

If their premiums [i.e., the premiums of class members during the years in which they were group rated] had been adequate to cover their claims and their expenses at the same relative level as everybody else, * * * their calculated premiums would have been higher by $1.8 billion. That's what we mean by a cross-subsidy benefit. * * * They paid less by this much than they would have [paid] if there had been no cross subsidies in the system.

{¶46} Conger also treated dividends differently than Schwartz. Whereas Schwartz, under his formula, deducted dividends upfront along with other premium discounts in calculating the amount of premium overcharges, Conger deducted dividends, in the aggregate, after applying his cross-subsidy modifier. Conger testified, that based on his analysis, the class as a whole did not pay "inflated" premiums and was not overcharged during the class period. Instead, Conger claimed that the class as a whole benefitted from the BWC's group rating program. Specifically, Conger testified that when taking into account the $1.87 billion in dividends the BWC paid class members in 2001-2004 and the "cross-subsidy benefits" those class members who migrated between group and nongroup rating received during the class period, the BWC actually experienced a net loss of $861 million from the class.

### C. The Trial Court's Ruling

{¶47} On December 28, 2012, the trial court issued its partial order and opinion, holding that plaintiffs were entitled to restitution as a result of the BWC's violation of former R.C. 4123.29 and 4123.34(C). The trial court's opinion is detailed, provides a well-reasoned analysis of the applicable facts and law, and clearly identifies the testimony and other evidence supporting its findings. With respect to the procedural challenges raised by the BWC, the trial court held that because plaintiffs sought "the return of a

specific amount which they claim has been wrongfully collected by the BWC," their claim was "an equitable one for restitution" over which the common pleas court could properly exercise jurisdiction pursuant to R.C. 2743.03(A)(2). The trial court further determined that compliance with the administrative review process would have been futile and that the plaintiff class, therefore, was not required to exhaust administrative remedies before filing suit. With respect to the merits of plaintiffs' claim, the trial court determined that the BWC had "received and retained excess premiums charged to the Plaintiff Class" during the class period and, in doing so, violated R.C. 4123.29 and 4123.34(C). The trial court further found that the BWC "must disgorge the excess premiums" it had unlawfully collected and that the plaintiff class was entitled to restitution of the amounts by which they were overcharged.

{¶48} As to the amount of restitution to be awarded, the trial court held that the formula offered by plaintiffs' actuarial expert, the Schwartz formula, was a "sufficiently reliable method * * * based on actuarial [principles]" to determine the amount by which the plaintiff class had been overcharged. The trial court, however, denied plaintiffs' request to recover investment income the BWC had allegedly earned on the premium overcharges, concluding that plaintiffs had failed to establish the value of the investment income, if any, the BWC had earned on the overcharges. The trial court also rejected plaintiffs' claim that the BWC's group rating plan violated the Ohio Constitution's Equal Protection Clause, concluding that the BWC's classifications and differential treatment were rationally related to promoting workplace safety, a legitimate state interest.

**{¶49}** Due to issues with the data that had been produced, the trial court held that the specific amount of restitution owed the plaintiff class could not be determined based on the evidence presented at trial. The trial court, therefore, reserved its determination of the restitution amount and ordered the parties to use the Schwartz formula to calculate "a final restitution figure." On March 20, 2013, following a hearing on the final restitution amount, the trial court issued its final judgment, awarding plaintiffs $859,440,258.79 in restitution on their unjust enrichment claim. Although the trial court made no explicit finding in its partial order and opinion that the BWC was unjustly enriched as a result of its unlawful premium overcharges, in its final order and opinion, the trial court states: "The Court issued a Partial Order and Opinion on December 28, 2012, which found the Defendant collected premiums in violation of Ohio statute and, as a result, the Defendant was unjustly enriched."

**{¶50}** The BWC appealed, presenting the following nine assignments of error:

**Assignment of Error 1**

The trial court erred as a matter of law by holding that BWC abused its rate-setting discretion and violated R.C. 4123.29 and R.C. 4123.34.

**Assignment of Error 2**

The trial court erred as a matter of law by holding that Plaintiffs were not obligated to exhaust statutorily specified administrative remedies applicable to Plaintiffs' premium protest.

**Assignment of Error 3**

The trial court erred as a matter of law by holding that BWC was unjustly enriched through an alleged violation of R.C. 4123.29 and an unalleged violation of R.C. 4123.34.

**Assignment of Error 4**

The trial court abused its discretion by overruling BWC's Motion for Leave to File an Amended Answer to assert the additional affirmative defense of set-off — a motion made over a year before trial and before any discovery cut-off had been established.

**Assignment of Error 5**

The trial court erred as a matter of law by holding that Plaintiffs are entitled to "equitable restitution" for unjust enrichment without taking into account important equitable considerations relating to the totality of the circumstances — including the undisputed fact that, far from benefitting from policies provided to Plaintiffs, BWC incurred $861 million more in claims costs than Plaintiffs paid in premiums on policies provided to Plaintiffs over the Class Period.

**Assignment of Error 6**

The trial court abused its discretion by failing to decertify the Plaintiff Class in light of new facts and circumstances not present at the time of class certification.

**Assignment of Error 7**

The trial court abused its discretion by denying BWC's *Miller Bike/Daubert* Motion to exclude the "expert testimony" of Allan I. Schwartz, by adopting the "Schwartz formula" to calculate restitution, and then by misapplying that formula.

**Assignment of Error 8**

The trial court erred as a matter of law by holding that it had subject matter jurisdiction over this case where the damages sought are a legal remedy over which the Court of Claims has exclusive jurisdiction.

**Assignment of Error 9**

The trial court erred as a matter of law by failing to apply the statute of limitations applicable to claims against the State of Ohio.

{¶51} Plaintiffs filed a cross-appeal, raising the following two cross-assignments of error:

**Cross-Assignment of Error 1**

The Trial Court erred in holding that Defendant did not violate Plaintiffs' right to equal protection guaranteed by Section 2, Article I of the Ohio Constitution.

**Cross-Assignment of Error 2**

The Trial Court erred in holding that Defendant is not required to disgorge the investment returns earned by Defendant on Plaintiffs' funds that Defendant wrongfully collected and retained.

## II.    Analysis

{¶52} For judicial clarity and ease of discussion, we consider the parties' assignments of error out of order and together where appropriate. We address the BWC's eighth assignment of error first.

### A.    Subject Matter Jurisdiction

{¶53} In its eighth assignment of error, the BWC challenges the trial court's determination of subject matter jurisdiction. The BWC argues that the restitution sought by plaintiffs is actually a claim for money damages, i.e., a legal remedy over which the court of claims has exclusive jurisdiction, and that the trial court, therefore, erred as a matter of law in determining that it had subject matter jurisdiction over the case. "'Subject-matter jurisdiction is the power conferred on a court to decide a particular

matter on its merits and render an enforceable judgment over the action.'" *ABN AMRO Mtge. Group, Inc. v. Evans*, 8th Dist. Cuyahoga No. 96120, 2011-Ohio-5654, ¶ 5, quoting *Udelson v. Udelson*, 8th Dist. Cuyahoga No. 92717, 2009-Ohio-6462. In evaluating subject matter jurisdiction, we apply a de novo standard of review. *Id.*

{¶54} The law is clear that the court of claims "has exclusive jurisdiction over civil actions against the state for money damages that sound in law." *Measles v. Indus. Comm. of Ohio*, 128 Ohio St.3d 458, 2011-Ohio-1523, 946 N.E.2d 204, ¶ 7, citing R.C. 2743.02 and 2743.03. R.C. 2743.03 established the court of claims, granting it "exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in section 2743.02 of the Revised Code." However, R.C. Chapter 2743 does not divest other courts of jurisdiction "to hear and determine a civil action in which the sole relief that the claimant seeks against the state is a declaratory judgment, injunctive relief, or other equitable relief." *Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, ¶ 9; R.C. 2743.03(A)(2). A suit that seeks only equitable relief may be brought against the state in the court of common pleas. Thus, whether the trial court had subject matter jurisdiction over plaintiffs' claim turns on whether plaintiffs' claim for restitution sounds in equity or in law. To determine whether a claim for restitution seeks equitable or legal relief, we must "look to the basis for the plaintiffs' claim and the nature of the underlying remedies sought." *Cristino v. Ohio Bur. of Workers' Comp.*, 118 Ohio St.3d 151, 2008-Ohio-2013, 886 N.E.2d 857, ¶ 7.

**{¶55}** The BWC argues that plaintiffs seek the recovery of "unliquidated sums," rather than the return of specific, traceable funds, and that their restitution claim, therefore, seeks "purely legal relief." In *Santos*, *supra,* the Ohio Supreme Court explained the difference between restitution claims sounding in law and those sounding in equity as follows:

> Restitution is available as a *legal* remedy when a plaintiff cannot "'assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him.'" *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), quoting Dobbs, *Law of Remedies* Section 4.2(1), 571 (2d Ed.1993). Restitution is available as an *equitable* remedy "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214, 122 S.Ct. 708, 151 L.Ed.2d 635.

*Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, at ¶ 13; *see also Measles* at ¶ 9.

**{¶56}** Thus, not every claim for monetary relief constitutes a legal claim for money damages. *Interim HealthCare of Columbus, Inc. v. State Dept. of Admin. Servs.*, 10th Dist. Franklin No. 07AP-747, 2008-Ohio-2286, ¶ 15. "Even when the relief sought consists of the state's ultimately paying money, a cause of action will sound in equity if 'money damages' is not the essence of the claim." *Id.*, citing *Ohio Academy of Nursing Homes v. Ohio Dept. of Job & Family Servs.*, 114 Ohio St.3d 14, 2007-Ohio-2620, 867 N.E.2d 400, ¶ 15. "Unlike a claim for money damages where a plaintiff recovers

damages to compensate, or substitute, for a suffered loss, equitable remedies are not substitute remedies, but an attempt to give the plaintiff the very thing to which it was entitled." *Interim HealthCare* at ¶ 15, citing *Santos, supra.* "If the essence of a claim is * * * restitution for the state's unjust enrichment by withholding funds to which a worker had a statutory right, then the ultimate relief sought is equitable restitution." *Measles* at ¶ 9, citing *Ohio Academy of Nursing Homes* at ¶ 15-19.

{¶57} In *Santos*, the Ohio Supreme Court considered whether the common pleas court had subject matter jurisdiction over a restitution claim brought by injured workers who sought to recover funds the BWC had collected pursuant to a subrogation statute that was later declared unconstitutional. *Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, at ¶ 3-8. Because the plaintiffs sought repayment of specific funds wrongfully collected and held by the state, the court held that their claim sounded in equity and could be addressed by the courts of common pleas. *Id.* at ¶ 17. As the court explained:

> This court held in [*Holeton v. Crouse Cartage Co.*], 92 Ohio St.3d 115, 2001-Ohio-109, 748 N.E.2d 1111, that the workers' compensation subrogation statute was unconstitutional. Accordingly, any collection or retention of moneys collected under the statute by the BWC was wrongful. The action * * * is not a civil suit for money damages but rather an action to correct the unjust enrichment of the BWC. A suit that seeks the return of specific funds wrongfully collected or held by the state is brought in equity. Thus, a court of common pleas may properly exercise jurisdiction over the matter as provided in R.C. 2743.03(A)(2).

*Santos* at ¶ 17.

{¶58} Other cases have similarly recognized that where, as here, a state agency collects money to which it is not entitled, an action to recover those funds is generally considered a claim for equitable restitution. *See, e.g., Ohio Hosp. Assn. v. Ohio Dept. of Human Servs.*, 62 Ohio St.3d 97, 104-105, 579 N.E.2d 695 (1991) (order to reimburse Medicaid providers for amounts unlawfully withheld pursuant to administrative rules improperly promulgated by the Ohio Department of Human Services was "not an award of money damages, but equitable relief"); *Interim HealthCare*, 2008-Ohio-2286 at ¶ 17 ("Cases in which a plaintiff claims a state agency has wrongfully collected certain funds are characterized generally as claims for equitable restitution."), citing *Morning View Care Center-Fulton v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 04AP-57, 2004-Ohio-6073, ¶ 19; *Dunlop v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 11AP-929, 2012-Ohio-1378, ¶13-16 (claim for reimbursement of child support payments that child support agency allegedly wrongly collected in excess of child support payments ordered by the common pleas court was a claim for equitable restitution).

{¶59} Plaintiffs' claim in this case is not a claim for general money damages to compensate the plaintiff class for the losses they sustained as a result of the BWC's alleged unlawful premium overcharges. Rather, plaintiffs seek to recover a specific amount of money they claim has been wrongfully collected from the class due to the BWC's alleged violation of R.C. 4123.29 and 4123.34(C). In other words, plaintiffs have asserted a claim for the return of the very thing to which the class was allegedly entitled in the first place — the amount of workers' compensation insurance premiums collected by the BWC in excess of the premiums the class allegedly should have been charged. The fact that plaintiffs seek to recover only a portion of the premiums paid, i.e., the portion of premiums paid that exceeded the amount they should have been charged, or that a calculation must be made to determine the amount by which class members were overcharged, does not change the nature of the relief sought nor does it transform

plaintiffs' claim from a claim seeking equitable relief into one seeking money damages.

{¶60} The BWC argues that because Schwartz's restitution calculation is based upon a "reasonable value for the premium overcharge," plaintiffs' claim is necessarily one for money damages, i.e., a claim for legal restitution, rather than a claim for the return of specific funds in equity. We disagree. Simply because the amount of an overcharge may be difficult to calculate or there may be a disagreement as to the specific amount by which a plaintiff was overcharged, does not mean the plaintiff loses his or her right to equitable restitution of the overcharge (assuming other requirements for equitable restitution have been met). The amount of the overcharge is simply a factual issue to be resolved by the trier of fact.[18] It was, therefore, sufficient that plaintiffs' expert's calculations generated a "reasonable valuation" of the amount of the BWC's premium overcharges during the class period.

---

[18]The amount of the overcharge, i.e., the difference between the premium payments the BWC actually received from each class member during the class period under the BWC's allegedly inequitable rating system and the premium payments the BWC would have received from that class member if the BWC had implemented a lawful rating system, cannot be calculated with absolute certainty because there is a range of rating systems that the BWC, in its discretion, could have implemented during the class period that would have complied with R.C. 4123.29 and 4123.34(C). Under each such rating system, nongroup-rated employers would have likely paid slightly different premium rates. Indeed, Schwartz expressly acknowledged that his formula failed to capture all of the premium overcharges to class members in the class period. *See supra* at ¶ 41, fn. 16. Because the restitution calculation generated under his formula was less than the total subsidies calculated by the actuarial experts the BWC had previously retained to evaluate its group rating plan, Schwartz opined that his formula resulted in a "conservative" approximation of the amount by which nongroup-rated employers were overcharged during the class period.

**{¶61}** Nor, as the BWC contends, does the fact that the BWC distributed the funds after the excessive premiums were allegedly wrongfully collected from the class — such that the specific funds constituting plaintiffs' overpayments may no longer be readily traceable — transform plaintiffs' claim from one sounding in equity into one in law. *See Dunlop,* 2012-Ohio-1378 at ¶13-16 (merely because child support agency might have eventually distributed the allegedly improperly collected child support to the child support obligee, the state government, or the federal government did not transform plaintiff's claim seeking restitution of those funds from one sounding in equity to one sounding in law; what child support agency "might have subsequently done with the funds is not relevant to the determination of subject-matter jurisdiction"). Because plaintiffs seek the return of the specific premiums they claim were unlawfully collected by the BWC, their claim is one for equitable restitution. *Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, at ¶ 14, 17. Accordingly, the trial court did not err in determining that it had subject matter jurisdiction in this case.[19] The BWC's eighth assignment of error is overruled.

---

[19] The BWC also argues that plaintiffs' claim should be regarded as a claim for legal restitution because the plaintiff class was certified under Civ.R. 23(B)(3) as a Civ.R. 23(B)(3) "damages" class. Civ.R. 23(B)(3) is the broadest provision under which classes may be certified under Civ.R. 23 and often includes classes in which the class seeks the recovery of money damages. However, nothing in Civ.R. 23(B)(3) limits classes certified under that provision to classes seeking the recovery of money damages or otherwise precludes the certification of classes seeking equitable relief under Civ.R. 23(B)(3). *See, e.g., In re Cordis Corp. Pacemaker Prod. Liab. Litigation v. Cordis Corp.,* S.D.Ohio No. C-3-86-543, 1992 U.S. Dist. LEXIS 22612, *34, fn. 21 (Dec. 23, 1992) ("When appropriate, a court can grant equitable relief in a class action certified under Rule 23(b)(3)."), citing *In re Asbestos School*

## B. Exhaustion of Administrative Remedies

{¶62} In its second assignment of error, the BWC contends that the trial court erred as a matter of law in failing to dismiss plaintiffs' complaint for failure to exhaust administrative remedies. The BWC claims that plaintiffs were required to comply with the administrative review process set forth in R.C. 4123.291 and Ohio Adm.Code 4123-14-06 for challenges to risk premium matters before seeking relief in the court of common pleas. The BWC maintains that because plaintiffs did not protest their premium rates through the administrative process, they are not entitled to judicial relief.

{¶63} The determination of whether a complaint should be dismissed for failure to exhaust administrative remedies presents a question of law that we review de novo. *Martin v. Ohio Dept. of Rehab. & Corr.*, 140 Ohio App.3d 831, 835, 749 N.E.2d 787 (4th Dist.2001). "It is a 'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed * * * injury until the prescribed administrative remedy has been exhausted.'" *State ex rel. Teamster Local Union No. 436*, 132 Ohio St.3d 47, 2012-Ohio-1861, 969 N.E.2d 224, ¶ 19, quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). Thus, a party must generally "exhaust any administrative remedy that could provide him with the relief he seeks" before seeking judicial intervention. *Driscoll v. Austintown Assocs.*, 42 Ohio St.2d 263,

*Litigation,* 104 F.R.D. 422, 439 (E.D. Pa. 1984) ("It is * * *well settled that certification under 23(b)(3) does not preclude the granting of appropriate equitable relief."), citing 7A C. Wright and A. Miller, *Federal Practice and Procedure*, Section 1784, 127 (1972).

273, 328 N.E.2d 395 (1975). Exhaustion of remedies is required to avoid "'premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'" *State ex rel. Teamster Local Union No. 436* at ¶ 19, quoting *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Exhaustion of administrative remedies is an affirmative defense, which the BWC bore the burden of proving. *AMM Property Invest., Inc. v. Cleveland,* 8th Dist. Cuyahoga No. 99848, 2014-Ohio-821, ¶ 3; *Cleveland Constr., Inc. v. Kent State Univ.*, 10th Dist. Franklin No. 09AP-822, 2010-Ohio-2906, ¶ 48.

**{¶64}** Where an administrative agency has no power to afford the relief sought or an administrative appeal would otherwise be futile, exhaustion of administrative remedies is not a prerequisite to seeking judicial relief. *State ex rel. Teamsters Local Union No. 436* at ¶ 23-24; *see also Kaufman v. Newburgh Hts.*, 26 Ohio St.2d 217, 219, 271 N.E.2d 280 (1971) ("'failure to exhaust administrative remedies available' may be a defense * * * only if interposed * * *, and if a remedy exists which is effectual to afford the relief sought"). In determining futility for exhaustion of remedies purposes, it does not matter that it may be improbable that the claimant will receive the requested relief. "'The focus is on the power of the administrative body to afford the requested relief, and not on the happenstance of the relief being granted.'" (Emphasis omitted.) *State ex rel. Teamsters Local Union No. 435* at ¶ 24, quoting *Nemazee v. Mt. Sinai Med. Ctr.*, 56 Ohio St.3d 109,

115, 564 N.E.2d 477 (1990); *see also McNally v. Cleveland*, 8th Dist. Cuyahoga No. 92697, 2010-Ohio-512, ¶ 12 ("'[a] vain act is defined in the context of lack of authority to grant administrative relief and not in the sense of lack of probability that the application for administrative relief will be granted'"), quoting *Gates Mills Invest. Co. v. Pepper Pike*, 59 Ohio App.2d 155, 167, 392 N.E.2d 1316 (8th Dist.1978). A plaintiff cannot escape the exhaustion of remedies requirement by bringing claims as a class action. *See, e.g., State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 10th Dist. Franklin No. 04AP-1293, 2005-Ohio-6612, ¶ 45, 53.

{¶65} The trial court held that plaintiffs' challenges to the "lawfulness and constitutionality" of the BWC's rules and regulations were "outside the scope of the Adjudicating Committee's power," as set forth in Ohio Adm.Code 4123-14-06(F). Because the adjudicating committee "lacked the jurisdictional authority to address the [p]laintiffs' claims," the trial court held that plaintiffs were not obligated to exhaust any administrative remedies prior to filing suit because "administrative remedies would have been futile."

{¶66} The BWC contends that the premium rate dispute in this case falls squarely within the types of decisions employers can — and must — pursue through the administrative review process and that the trial court erred in concluding otherwise. The BWC's exhaustion of administrative remedies defense thus turns on whether the adjudicating committee had the authority to address plaintiffs' claim and whether the

wrongs alleged by the plaintiff class could have been corrected by the administrative review process.

{¶67} Under R.C. 4123.291(A), any employer "desiring to file a request, protest, or petition" regarding certain categories of matters specified in the statute must file the request, protest or petition with the adjudicating committee within 24 months after the administrator sends notice of the determination that is the subject of the request, protest, petition. Relevant to this case, the specified matters that the adjudicating committee has the authority to address includes "[a]ny decision relating to any other risk premium matter under Chapters 4121., 4123., 4131. of the Revised Code." R.C. 4123.291(B)(6). Similarly, Ohio Adm.Code 4123-14-06(F) provides, in relevant part:

> The administrator may authorize the adjudicating committee to consider the following matters:
>
> (6) Any other risk or premium matters as authorized and delegated by the administrator under Chapters 4121., 4123., and 4131. of the Revised Code.

{¶68} If an employer does not prevail before the adjudicating committee, the employer may appeal the decision of the committee to the administrator or the administrator's designee. R.C. 4123.291(B); Ohio Adm.Code 4123-14-06(E).

{¶69} Amici curiae urge us to reverse the trial court's ruling that plaintiffs were not required to exhaust administrative remedies based on *Brown v. Levin*, 10th Dist. Franklin No. 11AP-349, 2012-Ohio-5768. In *Brown*, the plaintiff brought a class action against the Ohio Tax Commissioner seeking equitable restitution of sales tax he contended was improperly collected on the value of vehicles traded-in as part of the

"Cash for Clunkers" program. *Id.* at ¶ 2. Brown had been charged (and paid) Ohio sales tax on the total purchase price of a new vehicle he had purchased, which included the $3,500 value of his trade-in vehicle. *Id.* at ¶ 4. Brown alleged that, under R.C. 5739.01(H)(2), the trade-in value should have reduced the purchase price of the vehicle for sales tax purposes and that he and other members were, therefore, unlawfully charged Ohio sales tax on their vehicles' trade-in values. *Id.* at ¶ 11, fn. 1. The tax commissioner moved to dismiss Brown's complaint on, among other grounds, that Brown and the class failed to exhaust administrative remedies prior to seeking judicial intervention. *Id.* at ¶ 7. Brown argued that because the tax commissioner had previously issued an "information release," "an 'official statement' declaring the policy of the Tax Commissioner," which was adverse to the claims of Brown and the putative class, it was "certain that any application filed under R.C. 5739.07 would be rejected" and that, therefore, an application for refund under R.C. 5739.07 would be "futile." *Id.* at ¶ 20, 37-38. He further argued that, based on the information release, filing an application for refund would necessarily require an appeal to the BTA, which was not cost-effective, and that the administrative remedy was therefore inadequate. *Id.* at ¶ 37. Citing its prior decision in *Telsat, Inc. v. Micro Ctr., Inc.*, 10th Dist. Franklin No. 10AP-229, 2010-Ohio-5628, the Tenth District rejected Brown's arguments and held that Brown was required to exhaust the administrative remedies set forth in R.C. 5739.07 prior to pursuing an action in common pleas court:

> In *Telsat*, we rejected the assertion the statutory remedy in R.C. 5739.07 is inadequate simply based upon speculation that the Tax

Commissioner would deny all refunds requested under the statute. We noted that if the Tax Commissioner denied a refund, the applicant could still appeal the decision to the BTA and eventually to the Supreme Court of Ohio. Thus, even if the Tax Commissioner denied the requested refund, the plaintiff still had additional avenues for relief pursuant to the administrative process.

We also rejected Telsat, Inc.'s argument that the potential lack of cost-effectiveness made the remedy inadequate. Despite acknowledging that the costs of pursuing a small sales tax claim to the BTA and the Supreme Court of Ohio may substantially exceed the amount of the refund, we nevertheless found the administrative remedy to be adequate in *Telsat*. "The General Assembly * * * was aware that sales tax issues typically involve small amounts but nonetheless prescribed the process set forth in R.C. 5739.07, presumably because the initial cost of seeking a refund through the administrative process is less than if litigation were to be initiated to collect the illegal or erroneous tax." *Id.* at ¶ 27. We further found that, should the appeal of an adverse decision rendered by the Tax Commissioner result in a decision that is favorable to the applicant, that decision would likely resolve the claims of all of the remaining class members when the Tax Commissioner implemented the appellate court's determination. *Id.* at ¶ 27. This provided further support for the adequacy of the statutory remedy.

*Brown,* 2012-Ohio-5768 at ¶ 33-34.

**{¶70}** *Brown* is, however, distinguishable from this case. Under the administrative review process at issue in *Brown*, the tax commissioner had express authority to refund funds to a taxpayer who has paid "illegal or erroneous taxes." R.C. 5739.07. A taxpayer who believed sales tax had been "illegally or erroneously" collected could file an application for a refund. R.C. 5739.07(A) and (D). The tax commissioner would then have to determine the amount of refund to which the applicant is entitled, if any. R.C. 5739.07(E). If the taxpayer was dissatisfied with the commissioner's final

determination, he or she could appeal the decision to the Ohio Board of Tax Appeals and then to the court of appeals or the Ohio Supreme Court. R.C. 5717.02, 5717.04.

**{¶71}** In this case, however, there is nothing to suggest that the adjudicating committee (or, upon further review, the administrator or his designee) had the authority to address plaintiffs' claim that the BWC's group rating plan, the method by which the BWC set premiums as a result of that rating plan, and the excessive premiums nongroup-rated employers were allegedly charged as a result of the group rating plan, were unlawful and unconstitutional. Tracy Valentino, the BWC's chief fiscal and planning officer, testified that in deciding matters brought before it, the adjudicating committee follows the administrative rules that have been adopted by the BWC and determines whether the BWC followed those rules, not whether those rules are lawful. She further testified that the adjudicating committee had no authority to invalidate an administrative regulation adopted by the BWC or to determine that an administrative regulation violated the Ohio Constitution or the Ohio Revised Code.

**{¶72}** Since constitutional challenges are not within an administrative agency's jurisdiction, courts have long held that failure to exhaust administrative remedies is not a prerequisite to an action raising a constitutional challenge to agency action. *See, e.g., Roosevelt Properties Co. v. Kinney*, 12 Ohio St.3d 7, 8, 465 N.E.2d 421 (1984); *Herrick v. Kosydar*, 44 Ohio St.2d 128, 130, 339 N.E.2d 626 (1975); *Driscoll*, 42 Ohio St.2d 263, 328 N.E.2d 395, at paragraph two of the syllabus. "Because administrative bodies have no authority to interpret the Constitution, requiring litigants to assert constitutional

arguments administratively would be a waste of time and effort for all involved." *Jones v. Chagrin Falls*, 77 Ohio St.3d 456, 460-461, 674 N.E.2d 1388 (1997).

**{¶73}** Although exhaustion of administrative remedies is not generally required before a constitutional challenge may be raised, a party raising a constitutional challenge must still exhaust any applicable administrative remedies for any non-constitutional claims. *Silverberg v. State Bd. of Pharmacy,* 8th Dist. Cuyahoga No. 51777, 1987 Ohio App. LEXIS 6905, *6-8 (Apr. 2, 1987) (failure to exhaust administrative remedies applied to bar non-constitutional arguments that could have been considered through administrative review process). With respect to plaintiffs' non-constitutional arguments, this case is materially different from a case such as *Brown,* in which a taxpayer challenges a particular application of a tax provision, or one in which an individual employer challenges a premium it has been assessed, based on a particular application of the BWC's rules, classifications, or calculations. *Compare Arth Brass & Aluminum Castings, Inc. v. Conrad*, 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900; *State ex rel. Cafaro Mgt. Co. v. Kielmeyer*, 113 Ohio St.3d 1, 2007-Ohio-968, 862 N.E.2d 474; *State ex rel. RMS of Ohio, Inc. v. Ohio Bur. of Workers' Comp.*, 113 Ohio St.3d 154, 2007-Ohio-1252, 863 N.E.2d 160. In such cases, any "errors" impacting an individual employer (or even multiple employers) are fully correctable in the normal course upon administrative review. Because of the BWC's expertise in administering its own rules and regulations, it ordinarily should be given the opportunity to review the application of those rules and regulations to a particular factual context.

{¶74} Plaintiffs' challenges to their rates, however, do not involve individualized decisions concerning particular employers' risk accounts, but rather, a system-wide challenge to the manner in which premium rates were set by the BWC and a request for system-wide relief. Although the adjudicating committee (or, upon further review, the administrator or his designee) may have had the authority to make individual, manual premium rate adjustments under certain circumstances, nothing in the record (or the applicable rule and statute) suggests that the plaintiff class had an administrative remedy pursuant to which it could have required the BWC to change the manner in which it set premium rates. *See, e.g., AMM Peric Property Invest., Inc. v. Cleveland,* 8th Dist. Cuyahoga No. 99848, 2014-Ohio-821, ¶ 4, 6, 12 (where administrative agency lacks power to grant relief sought, administrative remedy may be inadequate); *Bowen v. New York*, 476 U.S. 467, 484-485, 106 S.Ct. 2022, 90 L. Ed.2d 462 (1986) (exhaustion of administrative remedies would have been futile and, therefore, was not required where challenged agency action involved a "systemwide, unrevealed policy" that was inconsistent with established regulations and did not "depend on the particular facts of the case before it"); *New Mexico Assn. for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir.1982) (plaintiff class was not required to exhaust administrative remedies before filing lawsuit where the "gravamen" of the lawsuit was that "the entire special education service system offered by the State is infirm" and the remedies offered at the administrative level did not include "a restructuring of the State's system" as sought by the class); *see also Espinoza-Gutierrez v. Smith*, 94 F.3d 1270, 1273 (9th Cir.1996)

(exhaustion of administrative remedies doctrine did not bar review of a question concerning the validity of an INS regulation due to conflict with a statute).

{¶75} Because adjudication of the lawfulness and constitutionality of the BWC's rating system and the relief sought by the plaintiff class were outside the scope of the administrative review process set forth in R.C. 4123.291, the trial court committed no error in concluding that plaintiffs were not obligated to exhaust administrative remedies prior to filing their complaint. The BWC's second assignment of error is overruled.

### C. The Trial Court's Determination that the BWC's Violations of Former R.C. 4123.29 and 4123.34(C) Warrant Equitable Restitution

{¶76} We now turn to the merits of plaintiffs' claim. In its first assignment of error, the BWC challenges the trial court's interpretation of the BWC's statutory rate-setting obligations under former R.C. 4123.29 and 4123.34(C) and its determination that the BWC's violation of those statutes warranted an award of equitable restitution to the plaintiff class. Because the parties offer conflicting interpretations of these statutes, determining whether the BWC violated former R.C. 4123.29 or 4123.34(C) necessarily involves an issue of statutory interpretation.

{¶77} "The primary goal in construing a statute is to ascertain and give effect to the intent of the legislature." *In re M.W.*, 133 Ohio St.3d 309, 2012-Ohio-4538, 978 N.E.2d 164, ¶ 17, citing *State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 11. We examine the plain language of the statute, "read words and phrases in context[,] and construe them according to the rules of grammar and common

usage." R.C. 1.42. In doing so, we attempt to give effect to "every word, phrase, sentence, and part of the statute" and to avoid an interpretation that would "restrict, constrict, qualify, narrow, enlarge, or abridge the General Assembly's wording" or that would otherwise render a provision meaningless or superfluous. *State ex rel. Carna v. Texas Valley Local School Dist. Bd. of Edn.,* 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 18-19. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise require "a technical interpretation in the light of the statutory purpose." *State v. Rentex, Inc.*, 51 Ohio App.2d 57, 60, 365 N.E.2d 1274 (8th Dist.1977), paragraph one of the syllabus, citing R.C. 1.42. If a statutory term is not defined, and is not shown to have a relevant "technical or particular meaning," it is "'accorded its plain and ordinary meaning.'" *State ex rel. Data Trace Information Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 49, quoting *Rhodes v. New Philadelphia*, 129 Ohio St.3d 304, 2011-Ohio-3279, 951 N.E.2d 782, ¶ 17.

### 1.   Violation of Former R.C. 4123.29

{¶78} Former R.C. 4123.29(A)(4)(c) stated, in relevant part:

In providing employer group plans under division (A)(4) of this section, the administrator shall consider an employer group as a single employing entity for purposes of retrospective rating.

{¶79} Plaintiffs argue that this provision, specifically the mandatory language "the administrator *shall consider* an employer group as a single employing entity *for the purposes of retrospective rating*" (emphasis added), required the BWC to implement a

retrospective group rating plan and *only* a retrospective group rating plan. Because there is no dispute that the BWC implemented only a prospective group rating plan during the class period, plaintiffs maintain the BWC violated former R.C. 4123.29(A)(4)(c). The trial court agreed. Concluding that there was nothing in the statute that authorized the BWC to implement a prospective group rating plan, the trial court held that the BWC's implementation of its prospective group rating plan "was in direct and clear violation of [R.C. 4123.29], not within their agency discretion, and therefore unlawful."

{¶80} The BWC contends that the trial court's ruling was based on a misreading of former R.C. 4123.29(A)(4)(c), and that, under a proper reading of the statute, the BWC was not precluded from implementing a prospective group rating plan. The BWC contends that former R.C. 4123.29(A)(4)(c) should be read only to require the BWC to consider an employer group as a single employing entity for the purposes of retrospective rating if it, in its discretion, chose to offer a retrospective group rating plan.

{¶81} Considering the plain and ordinary meaning of the language used in former R.C. 4123.29(A)(4) and giving effect to every phrase and word in that part of the statute, we agree with the trial court that former R.C. 4123.29(A)(4)(c) "reflects the General Assembly's conscious choice to require the BWC to use a retrospective plan, and sets forth that requirement in clear, unambiguous, and mandatory language." The statute directs that "[i]n providing employer group plans under division (A)(4)" — the section of the statute that required the BWC to implement a group rating plan — "the administrator *shall consider* an employer group as a single employing entity *for purposes of*

*retrospective rating.*" (Emphasis added.) It is undisputed that the word "shall" is mandatory. The General Assembly is presumed to mean what it said. Where, as here, a statute is clear on its face, we must apply the statute as written. Had the General Assembly intended former R.C. 4123.29(A)(4)(c) to authorize the BWC to implement any form of group rating system, it would not have mandated that the BWC consider an employer group as a single group entity specifically "for purposes of retrospective rating," but rather, generally, for any form of "group rating."

{¶82} The BWC was constrained by the statutory authority granted to it by the General Assembly. *See, e.g., Taber v. Ohio Dept. of Human Servs.,* 125 Ohio App.3d 742, 750, 709 N.E.2d 574 (10th Dist.1998) ("'[A]n administrative agency may not legislate by enacting rules which are in excess of legislative policy, or which conflict with the enabling statute.'"), quoting *P.H. English v. Koster*, 61 Ohio St.2d 17, 19, 399 N.E.2d 72 (1990). The BWC's administrative rules and practices "cannot add [to] or subtract from the legislative enactment." *Amoco Oil Co. v. Petroleum Underground Storage Tank Release Comp. Bd.,* 89 Ohio St.3d 477, 483-484, 733 N.E.2d 592 (2000), citing *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Ohio Bur. of Emp. Servs.*, 21 Ohio St.3d 5, 10, 487 N.E.2d 288 (1986). Because former R.C. 4123.29(A)(4)(c) expressly required that employers be grouped "for purposes of retrospective rating," and there is no language in former R.C. 4123.29 authorizing the BWC to implement a prospective group rating plan, we find no error in the trial court's determination that the BWC's prospective group rating plan violated former R.C. 4123.29.

{¶83} The BWC also argues the trial court's restitution award should be reversed because "the restitution awarded has no causal connection to whether [the] BWC retrospectively rated group plans." The BWC claims that to award restitution to the plaintiff class based on a violation of former R.C. 4123.29, the trial court would have had to "reset premium rates and calculate restitution under a methodology that retrospectively rated group plans during the Class Period." We disagree.

{¶84} Although the difference between (1) the premium rates class members were charged by the BWC during the class period and (2) the premium rates class members would have been charged during that time period under a rating system that complied with former R.C. 4123.29(A)(4)(c) is one way the amount of the premium overcharges to the plaintiff class could have been calculated, it was not the only way. Contrary to the BWC's assertion, the trial court did not award restitution "based on a group-experience rating methodology" that it found "'was in direct and clear violation' of R.C. 4123.29." The trial court awarded restitution based on the Schwartz formula. The Schwartz formula is not a "rating methodology." The Schwartz formula calculated a "reasonable value" for the premium overcharges to the plaintiff class by substituting the inflated off-balance factors

the BWC had used in calculating base rates for the affected manual classes during the class period with a "corrected" off-balance factor of 1.23 — an off-balance factor the BWC's former chief actuary acknowledged would have resulted in a "more accurate" premium rates for nongroup-rated employers had it been used during the class period. The BWC's "no causal connection" argument is, therefore, meritless.

### 2. Violation of R.C. 4123.34

#### a. Plaintiffs Sufficiently Pled a Violation of R.C. 4123.34(C)

{¶85} With respect to the trial court's finding that it violated R.C. 4123.34, the BWC first argues that the trial court's judgment should be reversed because plaintiffs never specifically pled a violation of R.C. 4123.34 in their amended complaint and did not move for leave to further amend their complaint to conform to the evidence at the close of trial. The BWC's argument is meritless.

{¶86} During the many years this case has been pending, plaintiffs have consistently argued that the excessive discounts, subsidies, and inflated premiums allegedly resulting from the implementation of the BWC's group rating plan violated both R.C. 4123.29 and 4123.34(C). Although plaintiffs' amended complaint specifically references only R.C. 4123.29, and not R.C. 4123.34, it also expressly includes allegations that the BWC's group rating plan exceeded the BWC's rule-making authority and violated state law "because it accords group discounts of such an excessive magnitude

that it requires non-group employers in the same occupational classification as group-rated employers to pay a premium subsidy to cover the cost of excessive discounts." It also alleges that as a result of its collection and retention of excessive premiums from plaintiffs and other members of the class, the BWC has been unjustly enriched.

{¶87} The Ohio Civil Rules require only notice pleading, i.e., (1) "a short and plain statement of the claim showing that the party is entitled to relief" and (2) a "demand for judgment for the relief to which the party claims to be entitled" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Civ.R. 8. R.C. 4123.29 and 4123.34 together set forth the BWC's rate-setting authority and obligations. *See, e.g.,* R.C. 4123.34 ("The administrator, in the exercise of the powers and discretion conferred upon the administrator in section 4123.29 of the Revised Code, shall * * *."). Based on a careful reading of plaintiffs' amended complaint, we conclude that plaintiffs' claim that the BWC violated R.C. 4123.34 is fairly encompassed within the allegations of the amended complaint. Plaintiffs were not required to plead a legal theory of recovery. They were required to allege sufficient facts to give the BWC notice of their claim. *See, e.g., Thatcher v. Lauffer Ravines, LLC,* 10th Dist. Franklin No. 11AP-851, 2012-Ohio-6193, ¶ 43-48 (although claim was "not spelled out in the complaint by explicit reference to the appropriate statutory sections," case could nevertheless proceed on the theory that defendant violated various statutory provisions if the allegations in the complaint "provided fair notice to the defendants that the action

could proceed on this theory"), citing *Mounts v. Ravotti*, 7th Dist. Mahoning No. 07 MA 182, 2008-Ohio-5045, ¶ 25-26 (although complaint did not reference R.C. 5321.04, allegations of complaint that defendant had a duty to maintain the stairs, knew or should have known about the condition of the stairs, and failed to abate the condition of the stairs could be seen to assert both a common law premises liability cause of action and a cause of action under R.C. 5321.04(A)(2) for failing to repair the steps). Plaintiffs did that here.

### b. Requirements of R.C. 4123.34(C) and the Role of Deference to the BWC

{¶88} The BWC next argues that the trial court's judgment should be reversed on the ground that the trial court's finding that the BWC violated R.C. 4123.34 "is not supported by the law or the facts." We disagree.

{¶89} When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review. *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, 952 N.E.2d 1181, ¶ 5 (8th Dist.2011), citing App.R. 12(C) and *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). Judgments supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. *Domaradzki v. Sliwinski*, 8th Dist. Cuyahoga No. 94975, 2011-Ohio-2259, ¶ 6; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. If the evidence is susceptible to more than one interpretation, we must construe it consistently with the lower court's judgment. *Id.* In addition, we are mindful that the

weight to be given the evidence and the credibility of the witnesses are primarily for the trial court. *Kalain v. Smith*, 25 Ohio St.3d 157, 162, 495 N.E.2d 572 (1986). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal* at 80. "A finding of an error of law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.* at 81.

{¶90} Review of the trial court's determination that the BWC violated R.C. 4123.34 involves a mixed question of law and fact. As to the trial court's factual findings, we are "guided by a presumption" that the fact finder's findings are correct. *Id.* at 79-80. The interpretation of R.C. 4123.34, however, presents a legal issue that we review de novo. *Lang v. Dir., Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, 982 N.E.2d 636, ¶ 12.

{¶91} R.C. 4123.34 sets out various requirements that the BWC "shall observe" in setting rates. As it relates to this case, R.C. 4123.34 provides, in relevant part:

> It shall be the duty of the bureau of workers' compensation board of directors and the administrator of workers' compensation to safeguard and maintain the solvency of the state insurance fund * * * . The administrator, in the exercise of the powers and discretion conferred upon the administrator in section 4123.29 of the Revised Code, *shall fix and maintain*, with the advice and consent of the board, *for each class of occupation or industry, the lowest possible rates of premium consistent with the maintenance of a solvent state insurance fund and the creation and maintenance of a reasonable surplus, after the payment of legitimate claims* * * * . In establishing rates, the administrator shall take into account the

necessity of ensuring sufficient money is set aside in the premium payment security fund to cover any defaults in premium obligations. The administrator *shall observe all of the following requirements in fixing the rates of premium* for the risks of occupations or industries:

\* \* \*

(C) The administrator *may apply that form of rating system that the administrator finds is best calculated to merit rate or individually rate the risk more equitably*, predicated upon the basis of its individual industrial accident and occupational disease experience, *and may encourage and stimulate accident prevention*. The administrator *shall develop fixed and equitable rules controlling the rating system, which rules shall conserve to each risk the basic principles of workers' compensation insurance*. (Emphasis added.)

{¶92} Based on the evidence presented at trial, including reports from numerous independent actuarial experts highlighting the premium inequity problems created by the BWC's group rating plan and admissions by current and former BWC representatives that its group rating plan was causing nongroup-rated employers to pay "extra premium," substantial and inequitable subsidies, and "an additional 'off-balance' premium" on top of the amounts they should have paid, the trial court found that the BWC was "charging excessive premiums to non-group employers during the class period." The trial court further held that by knowingly overcharging nongroup-rated employers, the BWC "violated the very purpose of [R.C. 4123.34(C)]" and thus violated R.C. 4123.34(C). As the trial court explained:

In reviewing [R.C. 4123.34], the Court finds that the statute's purpose is to achieve a result; equity and fairness in the merit rating system. It is accurate that the specific method of achieving that equity is not explicitly prescribed, and therefore left to the BWC's discretion so long as it comports with workers' compensation [principles.] However, the evidence that has been established \* \* \* displays that the BWC: was aware of the inequity in the system; was aware it was violating the statutory mandate; and was

aware that the non-group employers were being charged excessive premiums back to 1991. * * * By charging non-group employers excess premiums that the BWC [knew] created inequity[,] the BWC engaged in a course of conduct that it knew violated the very purpose of the statute. * * * [T]he statute is devoid of any language affording the BWC the discretion to completely disregard the statute's purpose. * * * Therefore, the Court finds that the Defendant violated [R.C. 4123.34(C).]

{¶93} Relying on *State ex rel. Cafaro Mgt. Co. v. Kielmeyer*, 113 Ohio St.3d 1, 2007-Ohio-968, 862 N.E.2d 474, ¶ 8, and *State ex rel. RMS of Ohio, Inc. v. Ohio Bur. of Workers' Comp.*, 113 Ohio St.3d 154, 2007-Ohio-1252, 863 N.E.2d 160, ¶ 6, the BWC maintains that R.C. 4123.34 grants the BWC authority to implement whatever "form of rating system" the BWC, in its discretion, finds rates risks "more equitably" or "may encourage and stimulate accident prevention." The BWC argues that it, therefore, acted lawfully, i.e., within its discretion under R.C. 4123.34, in implementing and continuing its group rating plan to promote workplace safety, notwithstanding that the group rating plan created substantial premium inequity in the rating system. The BWC further argues that the trial court could not properly "intervene" in the BWC's rate-setting decisions without first finding that the BWC acted in an "arbitrary, capricious, or discriminatory manner" — a finding that it contends the trial court never made. The BWC also disputes the trial court's finding that the plaintiff class paid "inequitable premiums," claiming that the evidence shows that the class paid "appropriate premiums" and that the rating system implemented by the BWC, in fact, rated risks "more equitably" within the meaning of R.C. 4123.34(C). Once again, we disagree.

**{¶94}** Courts have long recognized the importance of granting the BWC deference in premium rate setting. Rate setting involves numerous complexities that courts are ill-equipped to address. As a result, courts generally have a narrow role in reviewing the rate-setting decisions of the BWC:

> Setting premium rates for workers' compensation coverage is one of the bureau's most challenging responsibilities. As early as 1928, we acknowledged the difficulty of this task, and we have repeatedly affirmed the deference due the agency in these matters. *State ex rel. Reaugh Constr. Co. v. Indus. Comm.*, 119 Ohio St. 205, 209, 162 N.E. 800 (1928); *State ex rel. McHugh v. Indus. Comm.*, 140 Ohio St. 143, 149, 42 N.E.2d 774 (1942); *State ex rel. Minutemen, Inc. v. Indus. Comm.*, 62 Ohio St.3d 158, 161, 580 N.E.2d 777 (1991); *State ex rel. Progressive Sweeping Contrs., Inc. v. Ohio Bur. of Workers' Comp.*, 68 Ohio St.3d 393, 395, 627 N.E.2d 550 (1994). Deference is required "in all but the most extraordinary circumstances," with judicial intervention warranted only when the agency has acted in an "arbitrary, capricious or discriminatory manner." *Id.* at 395-396, 627 N.E.2d 550.

*Cafaro* at ¶ 8.

**{¶95}** In *Cafaro*, *supra,* a real estate management firm objected to the BWC's reclassification of its clerical workers and security personnel in setting its premium rates for workers' compensation coverage, which resulted in higher basic premium rates. *Id.* at ¶ 2-4. Cafaro appealed, arguing that the BWC's reclassification of its workers placed its workers in classifications with other positions for which the risk was not equivalent. *Id.* The BWC's adjudicating committee rejected Cafaro's arguments, and the administrator's designee affirmed the adjudicating committee's decision, leading Cafaro to file a writ of mandamus with the Ohio Supreme Court. *Id.* at ¶ 5-7.

{¶96} Specifically, Cafaro objected to (1) the BWC's placement of its clerical employees working at corporate headquarters into the same classification as its clerical employees working in shopping malls and (2) the BWC's placement of both Cafaro's maintenance and security personnel into the same classification. *Id.* at ¶ 14-16. Cafaro argued, based on its own claims history, that mall clerical workers have a more hazardous job than corporate clerical workers and that maintenance workers were more injury prone than security personnel and that the BWC's classification of these disparate workers into the same groups, therefore, violated the BWC's directive to classify workers according to hazard. *Id.* at ¶ 15, 19. The court disagreed. The court held that Cafaro's individual claims experience did not establish that, industrywide, the hazard to clerical workers in a mall office was sufficiently greater than the hazard to other clerical workers to support Cafaro's claims that its employees were not classified according to hazard and that Cafaro's employees reasonably fell within the classifications to which they had been reassigned by the BWC. *Id.* at ¶ 15-17, 19. Because neither of the occupational reclassifications was shown to be arbitrary, capricious, or discriminatory, the court denied the writ. *Id.* at ¶ 20.

{¶97} Similarly, in *RMS*, *supra,* the BWC reclassified the plaintiff's employees into a classification that required payment of a higher workers' compensation premium. *RMS,* 113 Ohio St.3d 154, 2007-Ohio-1252, 863 N.E.2d 160, at ¶ 2. RMS provided in-home care services to mentally handicapped and developmentally disabled individuals. *Id.* Although RMS conceded that it did not provide services to individuals in a

group-home setting and was not a charitable institution — the businesses explicitly covered by the classifications to which its employees had been previously assigned — it argued that reclassification was unwarranted because the duties (and risks) of employees within those classifications were similar to those of its employees. *Id.* at ¶ 8-20. After an unsuccessful appeal to the BWC, RMS filed a mandamus action in the Tenth District. The Tenth District denied the writ, and RMS appealed to the Ohio Supreme Court. *Id.* at ¶ 4-5. In affirming the denial of the writ, the Ohio Supreme Court discussed the challenges involved in establishing workers' compensation premium rates and the deference, therefore, accorded the BWC "in these matters":

> The rate-making process starts with "classif[ying] occupations or industries with respect to their degree of hazard." R.C. 4123.29(A)(1). The goal is to "assign the one basic classification that best describes the business of the employer within a state." Ohio Adm.Code 4123-17-08(D). It is an undertaking, however, in which "absolute precision * * * is often impossible." *Progressive Sweeping*, 68 Ohio St.3d at 395, 627 N.E.2d 550. Accordingly, we are "reluctant to find an abuse of discretion merely because the employer's actual risk does not precisely correspond with the risk classification assigned." *Id.* at 396, 627 N.E.2d 550.

*RMS* at ¶ 7.

{¶98} Because RMS had not established a clear legal right to inclusion in the original classifications to which its employees had been assigned, the court held that the BWC's reclassification of its employees was not an abuse of discretion. *Id.* at ¶ 25.

{¶99} This case, however, is different. The BWC has no discretion to violate a statute in setting premium rates. *See, e.g., State ex rel. Minutemen,* 62 Ohio St.3d at 161, 580 N.E.2d 777 (notwithstanding the "considerable deference generally afforded to the

commission to set rates[,] * * * [t]his "rate-setting expertise * * * cannot supersede a statutory mandate"); *Arth Brass*, 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900, at ¶ 37 (although BWC policy of immediately charging employer's risk account for amounts paid for employee's medical expenses may have seemed "reasonable as a way of doing business," BWC could not act "contrary to law"). Given that the trial court determined that the BWC violated R.C. 4123.34(C), it was not also required to make an explicit determination that the BWC had acted in an "arbitrary, capricious or discriminatory manner" in setting premium rates.

### c. Interpretation of R.C. 4123.34(C)

{¶100} In interpreting R.C. 4123.34(C), we apply the principles of statutory construction set forth above. We are also mindful that"'if a statute provides the authority for an administrative agency to perform a specified act, but does not provide the details by which the act should be performed, the agency is to perform the act in a reasonable manner based upon a reasonable construction of the statutory scheme.'" *Frisch's Restaurants, Inc. v. Ryan*, 121 Ohio St.3d 18, 2009-Ohio-2, 901 N.E.2d 777, ¶ 16, quoting *Northwestern Ohio Bldg. & Constr. Trades Council v. Conrad*, 92 Ohio St.3d 282, 287, 750 N.E.2d 130 (2001); *see also State ex rel. V&A Risk Servs. v. State Bur. of Workers' Comp.*, 10th Dist. Franklin No. 11AP-742, 2012-Ohio-3583, ¶ 23 (When interpreting statutes, "[c]ourts generally must give due deference to an administrative interpretation formulated by an agency that has accumulated substantial expertise and that has responsibility for implementing a legislative command."). Nonetheless, we agree

with the trial court that the BWC's group rating plan "does not result from a reasonable interpretation" of R.C. 4123.34.

{¶101} Under the first sentence of R.C. 4123.34(C), the BWC has discretion to implement the rating system the administrator determines is best calculated to merit rate or individually rate the risk "more equitably." The statute also provides that the BWC may also consider the state's interests in "encourag[ing] and stimulat[ing] accident prevention" in deciding which form of rating system to use. However, the exercise of discretion granted in the first sentence of R.C. 4123.34(C) is expressly constrained by the second sentence of R.C. 4123.34(C) — which the BWC completely ignores in its interpretation of the statute. Under the second sentence of R.C. 4123.34(C), the BWC "shall" develop "fixed and equitable rules controlling the rating system that conserve to each risk the basic principles of workers' compensation insurance." This, as is clear from the record, the BWC did not do.

{¶102} The terms "equitable" and "conserve" and the phrases "more equitably" and "basic principles of workers' compensation insurance" are not defined by the statute.[20] Black's Law Dictionary defines "equitable," in relevant part, as "[j]ust; conformable to the principles of justice and right." *Black's Law Dictionary* 537 (6th Ed.1990). The Webster's New World Dictionary similarly defines "equitable" as

---

[20] While we respect the General Assembly's desire not to unduly constrain the rate-setting process, perhaps much of the litigation surrounding this issue could have been avoided if the General Assembly had provided more specific guidance to the BWC as to what should be deemed to constitute "equitable" rules or how to evaluate whether a particular rating system rates risk "more equitably."

"characterized by equity; fair; just." *Webster's New World Dictionary* 383 (3d College Ed.1988). The Webster's New Collegiate Dictionary defines "equitable" as "having or exhibiting equity" and "dealing fairly and equally with all concerned." *Webster's New Collegiate Dictionary* 363 (1980). "Conserve" means "[t]o save and protect from loss or damage" or to "keep," "guard," "observe." *Black's Law Dictionary* at 306; *Webster's New Collegiate Dictionary* at 239. The "basic principles of workers' compensation" have been generally recognized to include protecting injured workers and employers from losses that result from workplace accidents, compensating injured workers and their beneficiaries, promoting workplace safety and accident prevention, and ensuring that each employer participating in the workers' compensation system pays an amount in premiums that reasonably corresponds with the risk that employer presents to the system. *See, e.g., State ex rel. Crystal Tissue Co. v. Indus. Comm. of Ohio*, 129 Ohio St. 320, 322, 195 N.E. 546 (1935); *State ex rel. Powhatan Mining Co. v. Indus. Comm. of Ohio*, 125 Ohio St. 272, 275-277, 181 N.E. 99 (1932); *State ex rel. Superior Foundry, Inc. v. Indus. Comm. of Ohio*, 168 Ohio St. 537, 542, 156 N.E.2d 742 (1959).

{¶103} The BWC argues that, as used in R.C. 4123.34(C), the phrase "more equitably" should be interpreted as matching "the right rate for the right risk." Bravender, the director of the BWC's actuarial department, testified that she interpreted "equitable" to mean "not necessarily equal" and "to set rates in a manner that provides premium to cover the insurance exposure that's presented by the insured." She further testified that she believed R.C. 4123.34(C) required the BWC to charge an "appropriate

premium" to an employer or group of employers "based on the costs they bring to the system." The BWC's former chief actuary, Pedrick, testified that there is no common actuarial definition of what it means to charge "equitable rates" but that the BWC generally interpreted R.C. 4123.34(C) as requiring rates that are reasonable and not excessive, inadequate, or unfairly discriminatory. He further testified that equity is not a fixed goal, that there are "levels of equity," and that "loss ratio" is often a "principal means of measuring equity."

{¶104} Accordingly, we interpret R.C. 4123.34(C) as requiring the BWC to implement a premium rating system with set rules that fairly and reasonably allocate the total premiums to be collected among all employers participating in Ohio's workers' compensation system based on the risk each employer presents to the workers' compensation system, resulting in rates that are fair and reasonable and not excessive, inadequate, or unfairly discriminatory.

{¶105} There are undoubtedly countless ways the BWC could design an experience rating plan to merit rate or individually rate risk "more equitably" or to "encourage and stimulate accident prevention." The specific method of achieving that result is not prescribed in the statute and is, therefore, left to the discretion of the BWC, provided the BWC otherwise complies with the statute. What the BWC did not have the authority to do under the statute — and what the trial court found that it did — was adopt

an experience rating system that was grossly *inequitable,* i.e., that rated employers' risks in a way that was significantly *more inequitable* than without that system.[21]

{¶106} The BWC argues that whether the BWC matched the right rate to the right risk should be determined solely through a "net income analysis" that compares the "net premiums" collected from the plaintiff class with the "ultimate claims costs" and expenses attributable to employees of the plaintiff class, considering "both the benefits and detriments of the group rating plan on class members."

{¶107} There is, however, no evidence that the General Assembly intended that the "equitableness" of the BWC's rating system be determined by such a net income analysis, that it is a measure commonly used in the industry to evaluate the "equitableness" of rating systems, or that the BWC, any of its actuarial consultants, or anyone else ever used such a net income analysis outside the context of this litigation to evaluate the "equitableness" of the BWC's rating system. As the BWC points out, the

---

[21]Insurance rate setting is not an exact science. R.C. 4123.34(C) does not require an exact correlation between premiums and risk. *See, e.g., State ex rel. Progressive Sweeping Contrs., Inc. v. Ohio Bur. of Workers' Comp.*, 68 Ohio St.3d 393, 396, 627 N.E.2d 550 (1994) ("we have been — and will continue to be — reluctant to find an abuse of discretion merely because the employer's actual risk does not precisely correspond with the risk classification assigned"). Equity is a range. Within that range, what is "more equitable" or "less equitable" is often in the eye of the beholder. However, there is a point at which conduct falls outside that range and becomes inequitable. That is what the trial court found occurred here. Although the BWC had discretion under R.C. 4123.34(C) to implement a rating system that incorporated premium discounts to promote accident prevention and workplace safety, the problem in this case was that the discounts provided to group-rated employers were so substantial and so disproportionate to the risks group-rated employers presented to the workers' compensation system, the system was inequitable and, therefore, violated R.C. 4123.34(C).

only person who ever performed such a net income analysis was its expert, Richard Conger, who performed the analysis strictly for purposes of this litigation.

{¶108} The BWC argues, based on Conger's analysis, that the plaintiff class did not pay premiums in excess of their claims, expenses, and "other benefits received" during the class period and that because its actuarial experts testified at trial that the group rating program and overall premium rates during the class period were actuarially sound "when considering the workers' compensation system in the aggregate," the plaintiff class did not pay "'inequitable' premiums," and the BWC did not violate R.C. 4123.34(C).

{¶109} The BWC does not attempt to reconcile Conger's conclusions with those of the many actuaries previously hired by the BWC to evaluate its group rating program — all of whom concluded unequivocally that nongroup-rated employers were paying more than they should have been fairly paying and group-rated employers were paying less than they should have been fairly paying under the BWC's rating system.

{¶110} Furthermore, the plain language of the statute suggests that the "equitableness" of rates should be evaluated, not, as the BWC now suggests, in the aggregate, i.e., considering the plaintiff class as a whole, but at the level of the individual risk. Under the statute, "[t]he administrator may apply that form of rating system that the administrator finds is best calculated to merit rate or individually rate *the risk* more equitably, predicated upon the basis of *its* individual industrial accident and occupational disease experience." (Emphasis added.) The statute further provides that the administrator "shall develop fixed and equitable rules controlling the rating system, which

rules shall conserve to *each risk* the basic principles of workers' compensation insurance." (Emphasis added.)

{¶111} Plaintiffs' evidence, as detailed above, included reports from numerous actuaries hired by the BWC to evaluate its group rating program, each of whom concluded that nongroup-rated employers were paying well more than their fair share of premiums under the BWC's rating system. Plaintiffs also presented evidence that the BWC admitted both publicly and privately that, during the class period, base rates paid by nongroup-rated employers were inflated as a result of the group rating plan and resulted in premium inequity. Elizabeth Bravender, the director of the BWC's actuary division, testified that "the [BWC] knew that nongroup-rated employers were paying higher rates than they should," when the rates were set. John Pedrick, former chief actuary for the BWC, confirmed that nongroup-rated employers paid "an additional 'off-balance premium'" on top of the amounts they should have been charged for workers' compensation coverage during the class period. He testified that the BWC's rating system did not rate risk "more equitably" and that the BWC had violated the mandate to develop equitable rules controlling its rating plan, conceding that "the rules, while they were fixed, weren't equitable." Then-BWC administrator Marsha Ryan similarly acknowledged, when testifying before the Ohio Senate Insurance Committee in October 2009, that "employers who were not in a group paid extra premium to make up the shortfall left as an effect of the large group discounts."

{¶112} The trial court, as the trier of fact, was in the best position to evaluate the witnesses' credibility and weigh the evidence, including the parties' conflicting loss ratio calculations and other claimed means of measuring of equity. Based on a careful review of the record, we find that competent, credible evidence supports the trial court's finding that the BWC knowingly maintained an inequitable rating system, resulting in excessive premiums payments by nongroup-rated employers, during the class period. Based on the trial court's factual findings, our review of the evidence, and a plain reading of the statute, we agree with the trial court's determination that the BWC violated R.C. 4123.34(C). Accordingly, the BWC's first assignment of error is overruled.

### D. Unjust Enrichment

#### 1. In General

{¶113} In its third and fifth assignments of error, the BWC contends that the trial court's determination that the BWC was unjustly enriched was against the manifest weight of the evidence and that the trial court erred as a matter of law in holding that the plaintiff class was entitled to equitable restitution for unjust enrichment without taking into account "important equitable considerations relating to the totality of the circumstances."

{¶114} Unjust enrichment occurs where "'a person has and retains money or benefits which in justice and in equity belong to another.'" *Smith v. Vaughn*, 174 Ohio App.3d 473, 2007-Ohio-7061, 882 N.E.2d 941, ¶ 10 (1st Dist.2007), quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20; *Hummel v.*

*Hummel*, 133 Ohio St. 520, 528, 14 N.E.2d 923 (1938). The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it. *Johnson* at ¶ 21, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954).   Restitution is the remedy provided upon proof of unjust enrichment "to prevent one from retaining property to which he is not justly entitled." *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957); *see also Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441 at ¶ 11 ("restitution [is] available as the remedy for an unjust enrichment of one party at the expense of another"), citing Restatement of the Law, Restitution, Section 9 (1937).

{¶115} To prevail on a claim for unjust enrichment, a plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant retained that benefit under circumstances in which it would be unjust for him to retain that benefit.   *Johnson* at ¶ 21; *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).    The BWC contends that plaintiffs failed to establish the first and third elements of their unjust enrichment claim.

### 2.    Benefit Conferred

{¶116} The BWC first argues that there was no evidence that the BWC benefitted at the expense of class members.   The BWC contends that the plaintiff class could not

have conferred any benefit on the BWC because: (1) the BWC is revenue-neutral, i.e., the BWC takes in only enough premiums to cover claims paid on behalf of injured workers and related administrative costs; (2) the premiums received from the class were used to pay administrative costs and deposited into the state insurance "to pay the costs of injuries incurred by Ohio workers"; (3) the "extra" premium payments paid by the class to "subsidize" group employers benefitted the group employers, not the BWC; and (4) the BWC paid more in claims costs related to class members' employees than class members paid the BWC in premiums during the class period.

{¶117} Based on our review of the record, we do not agree that plaintiffs failed to prove the plaintiff class conferred a benefit on the BWC. As discussed above, plaintiffs established that nongroup-rated employers paid excessive premium costs to the BWC for their workers' compensation coverage. If nongroup-rated employers had not paid these premiums, the BWC would have experienced a shortfall in the total premiums collected due to the large discounts it gave group-rated employers under its group rating plan. There would have then been insufficient funds in the state insurance fund to cover all of the costs of claims and expenses and to retain a reasonable surplus. Accordingly, the BWC clearly benefitted from the excessive premiums paid by the nongroup-rated employers in the plaintiff class.

{¶118} Even assuming that certain class members (or class members in the aggregate) may have paid the BWC less in premiums than the BWC incurred in claims costs related to those class members does not mean that a benefit was not conferred by

nongroup-rated employers on the BWC. The purpose of having insurance is to offset the risk of potential claims. Insurers charge premiums to a pool of insureds based on their expected risk, recognizing that some insureds will have losses within the policy period, including losses that may exceed the cost of coverage, and others will not. Insureds would have little need to purchase insurance if premiums were calculated, after the fact, based solely on their actual claims costs. We find that there was competent, credible evidence in the record that the plaintiff class conferred a benefit on the BWC.

### 3. *Unjust* Enrichment and the Totality of the Circumstances

{¶119} The BWC also contends that the trial court's judgment should be reversed and the case remanded on the ground that the trial court failed to consider the totality of the circumstances in determining that the BWC was unjustly enriched and awarding equitable relief to the plaintiff class.

{¶120} "'Enrichment alone'" is insufficient to "'invoke the remedial powers of a court of equity.'" *Chestnut v. Progressive Cas. Ins. Co.,* 166 Ohio App.3d 299, 2006-Ohio-2080, 830 N.E.2d 751, ¶ 30 (8th Dist.), quoting *Directory Servs. Group v. Staff Builders Internatl.,* 8th Dist. Cuyahoga No. 78611, 2001 Ohio App. LEXIS 3108 (July 12, 2001). Because the plaintiffs are seeking equitable relief based upon a claim of unjust enrichment, they "'must go further and show that under the circumstances,'" they have "'superior equity'" so that, as against the plaintiff class, "'it would be unconscionable for [the BWC] to retain the benefit.'" *United States Health Practices, Inc. v. Blake*, 10th Dist. Franklin No. 00AP-1002, 2001 Ohio App. LEXIS 1291,*6-7

(Mar. 22, 2001), quoting *Katz v. Banning*, 84 Ohio App.3d 543, 552, 617 N.E.2d 729 (10th Dist.1992). The trial court, therefore, was required to consider "the sum of the circumstances, as well as the equities involved in the case" in determining whether it would unjust to permit the BWC to retain the benefit conferred upon it by the plaintiff class and, if so, the appropriate relief to be awarded as a result of its unjust enrichment. *U.S. Health Practices*, 2001 Ohio App. LEXIS 1291 at *8.

{¶121} As noted above, the trial court's partial order and opinion is comprehensive. In 28 pages, the trial court clearly sets out its findings of fact and conclusions of law on each of the issues raised by the pleadings and the various pretrial motions filed by the parties. The trial court goes to great lengths to identify the evidence supporting its factual findings (including attaching 25 exhibits to its opinion) and thoroughly explains the analysis behind each of its legal conclusions. However, notably absent from either the trial court's partial order and opinion or its final order and opinion is any discussion of the trial court's court's consideration of the "totality of the circumstances" and "sum of the * * * equities involved in the case" in determining that the BWC "was unjustly enriched" because it "collected premiums in violation of [an] Ohio statute" and awarding millions in equitable restitution to the plaintiff class.

a. **Statutory Violation as a Basis for Unjust Enrichment**

{¶122} Relying on *State ex rel. Zone Cab Corp. v. Indus. Comm.*, 132 Ohio St. 437, 8 N.E.2d 438 (1937), and *Arth Brass & Aluminum Castings, Inc. v. Conrad*, 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900, the trial court held that the BWC was

unjustly enriched because it "collected premiums in violation of [an] Ohio statute." The BWC contends that the trial court improperly applied a "strict liability standard for unjust enrichment" in reaching this conclusion and that the trial court's judgment should be reversed because a statutory violation is an insufficient basis upon which to conclude that a defendant has been unjustly enriched.[22]

{¶123} Ohio courts have long recognized that persons from whom funds have been unlawfully collected and retained by the state may be entitled to equitable restitution. In *State ex rel. Zone Cab Corp., supra,* the Ohio Supreme Court determined that employers were entitled to a refund of workers' compensation premium "overpayments" paid on behalf of workers who were later determined to be independent contractors rather than employees. *State ex rel. Zone Cab Corp.,* 132 Ohio St. at 444, 8 N.E.2d 438. As the court explained in granting a writ of mandamus ordering a refund of the premiums that had been overpaid:

> The hazards which warrant the retention of premiums collected are those which arise out of the relation of employer and employee. When premiums have been paid to protect the State Insurance Fund pending litigation, and it is finally determined that collection has been made based on casualties suffered by those who were independent contractors and not employees, the excess of premiums paid acquires a new legal aspect. The fact that the statutes do not expressly provide for a refund is not controlling. If rates are imposed and collection made to provide for a contingency which may result

---

[22]The BWC also contends that the trial court's judgment should be reversed because R.C. 4123.29 and 4123.34 do not provide a private right of action. Plaintiffs, however, have brought a claim for equitable restitution to recover excessive premium payments wrongfully collected and retained by the BWC in violation of R.C. 4123.29 and 4123.34(C). Plaintiffs have not sought to enforce R.C. 4123.29 or 4123.34(C) by means of a civil suit for money damages asserting a private right of action.

in liability for compensation and the eventuality discloses that there is not and never could have been any liability because the claims grew out of an independent contractual relation, the overpayment should be refunded. The rationale of this concept is that the excess payments never did in reality belong in the State Insurance Fund and could be required in the first instance only for the purpose of meeting a possible adjudication requiring payment of compensation on the claims. The adjudication having been otherwise the excess is no longer properly a part of the fund and should be restored to the rightful owner.

The relator is entitled to a refund covering excessive payments under merit rating, and a writ of mandamus will be awarded commanding the refund * * *.

*Id.* at 443-444.

{¶124} In *Arth Brass,* the Ohio Supreme Court found the BWC was responsible for increased premiums paid by an employer where the BWC, in violation of a statute, assigned medical payments to an employer's risk account prior to the final resolution of the case, resulting in the employer being transferred into a group whose employers paid higher premiums.   As the court explained:

[I]n this case, the bureau has acted contrary to statute by assigning medical payments to an employer's risk account prior to the final resolution of the case. * * * Arth alleges that as a direct result of the actuarial information the bureau forced the employer's group to rely on, its group sponsor placed it in a group with higher premiums. Further, the bureau prevented Arth from amending its status until a year passed. Arth thus paid increased premiums, with no process available to have refunded the amount of overpayments required to be paid by the acts of the bureau.

As it stands, Arth has no way of recovering the increased premiums it paid to the bureau because of the bureau's reliance on illegally calculated and inaccurate data.   The bureau has no system in place for the calculation of a refund.

The bureau's policy thus fails on constitutional grounds, violating the right to remedy guaranteed by Section 16, Article I of the Ohio Constitution:

> "The right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution 'requires an opportunity [for remedial action] granted at a meaningful time and in a meaningful manner.'" * * * *State ex rel. Sysco Food Serv. of Cleveland, Inc. v. Indus. Comm.*, 89 Ohio St.3d 612, 614, 734 N.E.2d 361 (2000), quoting *Burgess v. Eli Lilly & Co.*, 66 Ohio St.3d 59, 62, 609 N.E.2d 140 (1993).

*Arth Brass,* 104 Ohio St.3d 547, 2004-Ohio-6888, 820 N.E.2d 900, at ¶ 50-52.

{¶125} The court held that the employer "should have the opportunity to prove" that the BWC's unlawful actions in prematurely assigning medical payments to the employer's risk account was the proximate cause of the increase in group premiums the employer paid when those medical payments were charged toward its experience. The court further held that the BWC "should be liable to credit [the employer] * * * to the extent that the premiums [the BWC] received exceeded those [the employer] would have made had the medical benefits not been charged to its risk account" and remanded the case for further proceedings. *Id.* at ¶ 53; *see also Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441 at ¶ 3-8, 17 (where injured workers brought a restitution claim to recover funds the BWC had wrongfully collected pursuant to a subrogation statute that was later declared unconstitutional, "[t]he action seeking restitution by Santos and his fellow class members [was] an action to correct the unjust enrichment of the BWC"); *Judy v. Ohio Bur. of Motor Vehicles,* 100 Ohio St.3d 122, 2003-Ohio-5277, 797 N.E.2d 45 (affirming decision requiring the BMV to refund excess license reinstatement fees collected as a result of an erroneous interpretation of R.C. 4591.191(L)); *State ex rel. Minutemen*, 62 Ohio St.3d 158, 580 N.E.2d 777 (1991) (unlawful premium overcharges resulting from the BWC's implementation of new manual classifications developed for

administrative convenience must be reimbursed); *In the Matter of an Increase in Fees by the New Jersey State Bd. of Dentistry,* 84 N.J. 582, 587, 423 A.2d 640 (1980) (concluding that a refund of fees "followed naturally" from the determination that they were illegally collected because to "hold otherwise would allow the [agency] to enrich itself unjustly as the expense of [the persons paying the fees]" and "would violate one of the cardinal principles of the common law, requiring restitution to prevent unjust enrichment").

{¶126} We do not read these cases as holding that a plaintiff is entitled to equitable restitution, as a matter of law, whenever funds are unlawfully collected and retained by the state, without regard to whether the state was unjustly enriched. Rather, we read these cases as holding that where the state collects and retains funds to which the state is not lawfully entitled, those funds must be returned as the equities require. Restatement of the Law 3d, Restitution and Unjust Enrichment, Section 19(1) (2011) ("payment of a tax that is erroneously or illegally assessed or collected, gives the taxpayer a claim in restitution against the taxing authority *as necessary to prevent unjust enrichment*") (Emphasis added.). In certain cases, the unlawful collection and retention of funds by the state may, in and of itself, constitute a sufficient basis for an award of equitable restitution, i.e., where the only issue is whether the collection and retention of funds by the state was unlawful and there is no dispute, once the state's conduct is determined to be unlawful, that (1) the state was unjustly enriched by its unlawful collection and retention of funds and (2) the equities require return of the funds. *See, e.g., State ex rel. Minutemen,* 62 Ohio St.3d at 161, 580 N.E.2d 777; *Arth Brass*, 104 Ohio St.3d 547,

2004-Ohio-6888, 820 N.E.2d 900; *Judy,* 100 Ohio St.3d 122, 2003-Ohio-5277, 797 N.E.2d 45. In others, such as this case, where there are a number of equitable considerations bearing on whether the state was unjustly enriched and, if so, the extent to which it was unjustly enriched, those considerations must be weighed and a determination of unjust enrichment made before a court may properly award equitable restitution on a unjust enrichment claim.

{¶127} The parties presented evidence at trial of a number of circumstances that are properly considered in determining whether, under the "totality of the circumstances," the BWC was unjustly enriched at the expense of the plaintiff class.

{¶128} It is undisputed that the BWC was responsible for developing and maintaining the unlawful rating system that granted excessive premium discounts to group-rated employers at the expense of nongroup-rated employers. Not only did the BWC fail to follow the legislative mandate to establish a retrospective group rating plan, it set up a prospective group rating plan without sufficient controls to address the plan's susceptibility to manipulation by group sponsors and the potential for premium inequity as a result of the generous discounts provided to group-rated employers under the plan. The BWC allowed group sponsors, on an annual basis, to self-select group members for their groups and to jettison, without consequence, those employers from the group who presented a higher risk, exacerbating the problems associated with the overly generous discounts provided to group-rated employers under the BWC's group rating plan.

{¶129} The record also reflects that the BWC continued to maintain its inequitable rating system long after actuarial consultants warned the BWC that the group rating plan was creating substantial premium inequity between group-rated and nongroup-rated employers and should, therefore, be changed. We appreciate that rate setting is complex and involves many elements. We also appreciate that it takes time to determine whether a rating system is operating equitably and time to develop and implement measures to fix a rating system that is operating less equitably than it should. However, the only reasonable conclusion that can drawn from the record in this case is that the BWC failed to take reasonable measures to correct its rating system once it learned its group rating plan was creating substantial premium inequity between group-rated and nongroup-rated employers.

{¶130} On the other hand, although the BWC benefitted from the excessive premiums it charged nongroup-rated employers (in that the excessive premiums avoided a shortfall in the overall premiums collected by the BWC), the BWC did not "profit" from its unlawful conduct per se, i.e., because the BWC is revenue-neutral, it collected the same amount of total premiums under the rating system at issue as it would have collected under a more equitable rating system.

{¶131} The source of the funds that would be used to pay a restitution award and the probable impact of such an award on the workers' compensation system are also factors to be considered. *See* Restatement of the Law 3d, Restitution and Unjust Enrichment, Section 19(2) (2011) ("If restitution * * * would disrupt orderly fiscal

administration or result in severe public hardship, the court may on that account limit the relief to which the taxpayer would otherwise be entitled."). In this case, the funds would come from the state insurance fund — "a trust fund for the benefit of employers and employees" to pay for medical care and to compensate injured workers and their beneficiaries when an employee is injured in a workplace accident. R.C. 4123.30. Although there was no evidence that the restitution award sought by plaintiffs in this case would render the state insurance fund insolvent or otherwise result in "severe public hardship," the evidence was less clear as to whether today's employers would have to be charged more in premiums to pay for a restitution award or to ensure a reasonable surplus was maintained in the state insurance fund after payment of such an award.

{¶132} Consideration of the "totality of the circumstances" and "sum of the equities" also required the trial court to consider that class members who were group rated during part of the class period themselves received substantial benefits, as a result of the unlawful subsidies charged nongroup-rated employers, during the policy years in which they were group rated. It is undisputed that it was the group-rated employers (including, for the years in which they were group rated, class members who participated in the BWC's group rating plan) who truly benefitted under the BWC's group rating plan, receiving a windfall in the form of substantially reduced premiums subsidized by nongroup-rated employers. Although there is no evidence in the record to suggest any wrongful conduct on the part of the group-rated employers themselves that led to their receipt of these unlawful benefits (at least as it relates to members of the plaintiff class)

— i.e., the group-rated employers appear to have simply paid the workers' compensation premiums they were charged by the BWC — because plaintiffs have come into court seeking relief in equity, the court must do what is equitable in light of all of the relevant considerations.

{¶133} Citing R.C. 4123.35, the trial court determined that, because the BWC was required to calculate and collect premiums on an annual basis, "[r]estitution should coincide with the BWC's statutory mandate, and be calculated based on a per-year basis" as well. Accordingly, the trial court held that if, in any given year, an employer was nongroup-rated in a manual class that had both nongroup-rated and group-rated employers and an off-balance of 1.23 or higher, the employer was entitled to restitution for that year, without regard to whether that employer benefitted in other policy years within the class period from the BWC's inequitable group rating plan. It is here we believe the trial court erred.

{¶134} Although R.C. 4123.35 states that premiums are to be fixed annually by the BWC and paid semi-annually by employers, we do not agree that R.C. 4123.35 constitutes a "statutory mandate" that each policy year "must stand on its own" in weighing the equities in this case. R.C. 4123.34(B) provides, in relevant part, that "[r]evisions of basic rates shall be in accordance with the oldest four of the last five calendar years of the combined accident and occupational disease experience of the administrator in the administration of this chapter."

{¶135} Plaintiffs have come into court seeking equitable relief over the class period, 2001-2008. As such, the totality of the circumstances and sum of the equities must be considered over that period. There is an abundance of competent, credible evidence in the record supporting the trial court's determination that the BWC was unjustly enriched by the premium overcharges it received from class members who were nongroup rated throughout the class period. Considering the totality of the circumstances, such class members clearly have "superior equity" so that "it would be unconscionable" for the BWC to retain the "benefits" it received at their expense. *United States Health Practices,* 2001 Ohio App. LEXIS 1291 at *6-7. However, the same cannot be said with respect to class members who migrated between nongroup rating and group rating during the class period — at least not without accounting for the subsidy benefits those class members received under the group rating system during the years within the class period in which those class members were group rated.

{¶136} Accordingly, we hold that the trial court erred in awarding equitable restitution to the plaintiff class without accounting for any of the subsidy benefits class members who were group-rated for part of the class period received during the years in which they were group-rated. Based on the record in this case, we conclude that equity requires that the restitution calculation for class members who were group rated during part of the class period include an offset for the subsidy benefits those class members received under the group rating plan during the years within the class period in which they were group rated. We do not prescribe a particular methodology for valuing the

offset to be provided (and offer no opinion as to whether Conger's valuation of the cross-subsidies received by class members is an accurate or appropriate means of valuing that offset), but leave that matter to the discretion of the trial court, mindful that "equity requires that the trial court be granted flexibility to achieve a just result." *Barker v. Jarrell*, 9th Dist. Lorain No. 07CA009126, 2007-Ohio-7024, ¶ 16.

{¶137} The BWC's third assignment of error is overruled. The BWC's fifth assignment of error has merit and is sustained in part. We remand the case for recalculation of the portion of the restitution award relating to class members who were group rated during part of the class period to include an offset for the subsidy benefits those class members received under the group rating plan during the years within the class period in which they were group rated. **E. Use of the Schwartz Formula to Calculate Restitution Awarded the Class**

{¶138} In its seventh assignment of error, the BWC contends that the trial court abused its discretion in (1) denying the BWC's *Miller Bike/Daubert* Motion to exclude the testimony of plaintiffs' expert Allan Schwartz, (2) adopting the formula offered by Schwartz to calculate restitution, and (3) misapplying that formula in calculating the restitution awarded to the plaintiff class.

{¶139} A trial court's decision to admit or exclude expert testimony will not be reversed absent an abuse of discretion. *Herzner v. Fischer Attached Homes, Ltd.*, 12th Dist. Clermont No. CA2007-08-090, 2008-Ohio-2261, ¶ 7, citing *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). An abuse of discretion means more than a mere error of law or judgment; it implies an arbitrary, capricious, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶140} It is undisputed that Schwartz's testimony related to matters beyond the knowledge or experience of laypersons and that Schwartz has the qualifications necessary to testify as an actuarial expert. Evid.R. 702(A) and (B). At issue is the reliability of Schwartz's testimony, specifically the reliability of the formula he developed to calculate the restitution owed to the plaintiff class. *See* Evid.R. 702(C). Plaintiffs, as the party offering the expert, had the burden of establishing the reliability of Schwartz's testimony. *See, e.g., Marcus v. Rusk Heating & Cooling, Inc.*, 12th Dist. Clermont No. CA2012-03-026, 2013-Ohio-528, ¶ 27 ("the party offering the expert opinion and testimony bears the burden of proof in establishing its admissibility"); *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 82 ("The proponent of the expert testimony has the burden to prove the admissibility of the testimony under Evid.R. 702.").

{¶141} Evid.R. 702(C) provides that where expert testimony involves "the result of a procedure, test, or experiment," the testimony "is reliable only if all of the following apply":

> The theory upon which the procedure, test or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, fact or principles;

> The design of the procedure, test or experience reliably implements the theory;

> The particular procedure, test or experiment was conducted in a way that will yield an accurate result.

{¶142} *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 687 N.E.2d 735 (1998), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593-594, 113

S.Ct. 2786, 125 L.E.2d 469 (1993), further provide that in "evaluating the reliability of scientific evidence, several factors are to be considered":

> (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.

*Miller* at 611, citing *Daubert* at 595.

{¶143} In determining whether an expert's opinions are reliable under Evid.R. 702(C), the court's focus is on whether the principles and methods the expert employed to reach his opinions are reliable, rather than whether the conclusions are correct. *See, e.g., State Farm Fire & Cas. Co. v. Holland*, 12th Dist. Madison No. CA2007-08-025, 2008-Ohio-4436, ¶ 21, citing *Miller* at 611.

{¶144} The trial court held that the Schwartz formula was a "sufficiently reliable method * * * based on actuarial principles" to determine the amount by which the plaintiff class had been overcharged and that "[i]t accurately determines a precise overcharged figure for each policy year for each class member." The BWC claims that Schwartz's opinions and methodology are unreliable and should have been excluded because: (1) his methodology was not shown at trial have been tested, subjected to peer review, to have an acceptable rate of error, or to have achieved general acceptance in the field of actuarial science; (2) the fluctuating "group-rated" and "nongroup-rated" employer segments used in the Schwartz formula lacked actuarial separation and were not proper actuarial classifications; (3) the Schwartz formula relied on a number of assumptions that the BWC claims were not supported by actuarial principles; and (4) if

the Schwartz formula had been used by the BWC in 2001-2008, it would have resulted in more than a $2.5 billion revenue shortfall.

{¶145} Giving due consideration to the parties' arguments and following a careful review of the record, we conclude that the trial court properly performed its gate-keeping function and considered all of the relevant, required factors in determining that Schwartz's testimony was admissible. We find that the BWC's arguments regarding the claimed deficiencies in Schwartz's methodology and formula go to the weight to be given his testimony, not its admissibility. Accordingly, the trial court did not abuse its discretion in permitting Schwartz to testify regarding his methodology and formula for calculating restitution.

{¶146} As to whether the trial court abused its discretion in adopting the Schwartz formula or misapplied that formula in calculating the restitution awarded to the plaintiff class, we conclude, for the reasons explained above, that the trial court erred in awarding restitution based on the Schwartz formula without providing an offset for the unlawful subsidy benefits class members who were group rated during part of the class period received during the time in which they were group rated. Accordingly, the BWC's seventh assignment of error is overruled in part and sustained in part.

## F. Motion for Leave to Amend Complaint to Assert Affirmative Defense of Setoff

{¶147} In its fourth assignment of error, the BWC contends that the trial court abused its discretion in denying it leave to amend its answer to assert an affirmative

defense of setoff. Given our determination that the trial court erred in awarding equitable restitution to the plaintiff class on their unjust enrichment claim without accounting for any of the subsidy benefits received by migrating class members, and our decision to remand the case for recalculation of the portion of the restitution award relating to those migrating class members, the BWC's fourth assignment of error is moot.

### G.      Motion to Decertify the Class

{¶148} In its sixth assignment of error, the BWC asks this court to revisit the issue of class certification.  The BWC contends that new facts and evidence, not present at the time of class certification, demonstrate that class certification is no longer proper and that the trial court, therefore, abused its discretion in denying the BWC's motion to decertify the plaintiff class.  Specifically, the BWC argues that because 28,909 class members will not receive restitution under the Schwartz formula, the class lacks a class-wide injury. The BWC also argues that "individualized inquiries" are necessary to identify the non-injured class members, to determine the amount of restitution owed to each, and to apply "defenses of mitigation, estoppel, laches, and setoff."  Finally, the BWC contends that the class should be decertified because it "has proved to be" an improper "fail-safe class."

{¶149} The trial court granted class certification on January 10, 2010.  This court affirmed class certification on April 7, 2011.  More than year later, on July 13, 2012, the BWC filed a motion for class decertification.  The trial court denied BWC's request for

decertification, "fail[ing] to see any new facts or circumstances" that would support decertification.   We agree.

{¶150} First, this court previously considered, and rejected, the BWC's arguments regarding the need for "individualized inquiries" and the fact that certain class members might not receive restitution in the BWC's 2011 appeal of the trial court's class certification order.   As we stated previously:

> A class action is not defeated solely because of some factual variations among class members.   Further, that some members may not be entitled to relief because of some particular factor will not bar the class action.

*San Allen*, 2011-Ohio-1676 at ¶ 20.

{¶151} The BWC's lack-of-a-class-wide-injury argument is based on Schwartz's restitution calculation.   Under the Schwartz formula, restitution was calculated only for class members who were rated in a manual class that (1) included both nongroup-rated and group-rated employers and (2) had an off-balance factor of 1.23 or higher.   The fact that certain class members receive no restitution under Schwartz's formula does not mean they sustained no injury.   *See supra* at ¶ 41, fn. 16.   The fact that plaintiffs' expert has now confirmed that certain class members will not receive restitution under his restitution formula does not warrant decertification of the class.

{¶152} We also reject the BWC's argument that the class should be decertified because it "has proved to be" an improper "fail-safe" class.   As with its other arguments,

the BWC has made no showing this argument is based on any new facts or evidence. The class definition has not changed since the trial court certified the class in 2010. Accordingly, the BWC's argument regarding the existence of a "fail-safe" class should have been raised before the class was originally certified.

{¶153} In any event, we do not agree that the class at issue is an improper "fail-safe class." A fail-safe class is a class "defined by reference to the merits of the claim." *Stammco, LLC v. United Tel. Co. of Ohio,* 136 Ohio St.3d 231, 2013-Ohio-3019, 994 N.E.2d 408, ¶ 8, fn. 2, quoting *Melton ex rel. Dutton v. Carolina Power & Light Co.,* 283 F.R.D. 280, 288 (D.S.C.2012), citing *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 826 (7th Cir. 2012), and *Manual for Complex Litigation* (Fourth) Section 21.222 (2004). It is a class whose members cannot be determined until after liability is found on the merits, and, then, the class includes only persons who are entitled to relief. *See, e.g., Stammco* at ¶ 8, fn. 2; *Miller v. Volkswagen of Am., Inc.*, 6th Dist. Erie No. E-07-047, 2008-Ohio-4736, ¶ 28. As the United States Court of Appeals for the Sixth Circuit explained in *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir.2012), such a class is prohibited because

> it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those "class members win or, by virtue of losing, they are not in the class" and are not bound. [*Randleman v. Fidelity Natl. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)]. Such a result is prohibited in large part because it would fail to provide the final resolution of the claims of all class members that is envisioned in class action litigation.

*Young* at 538; *see also Stammco* at ¶ 8, fn. 2 ("'Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.'"), quoting *Melton* at 288, quoting *Messner* at 826.

{¶154} The BWC asserts that the plaintiff class is a "fail-safe class" because "the merit issue of base rate 'inflation'" was included within the class definition. We disagree. There was no need for the court to decide the merits in order to determine who was in the class in this case. Class members, i.e., those employers "rated on a non-group basis * * * who paid premiums in a manual classification for which the base rate was 'inflated' due to experience modifications under the group experience rating plan," could be readily identified from the BWC's records.

{¶155} Further, the fact that members of the plaintiff class were charged "inflated" premium rates was not determinative of the BWC's liability, nor did it establish a right to restitution. The BWC's liability was based on whether the BWC violated its statutory obligations in imposing "inflated" premium rates and whether the BWC was unjustly enriched as a result of its collection and retention of those "inflated" premiums. The BWC argued that even if the plaintiff class was charged inflated premiums, the class was not entitled to equitable restitution because the BWC (1) did not violate any laws and (2) was not unjustly enriched. This argument "proves the point" that the class at issue "is not a proscribed fail-safe class." *See, e.g., Young* at 538 (class definition that included persons "who were charged local government taxes on their payment of premiums which

were either not owed, or were at rates higher than permitted" was not a fail-safe class where defendants argued that they would not liable even if class members were overcharged). The class, therefore, is not a "fail-safe class."

{¶156} The trial court did not abuse its discretion in denying the BWC's motion to decertify the class. BWC's sixth assignment of error is overruled.[23]

### H. Statute of Limitations

{¶157} In its ninth assignment of error, the BWC contends that the trial court erred as a matter of law by failing to apply to plaintiffs' claim the two-year statute of limitations applicable to civil actions against the state under R.C. 2743.16(A).

{¶158} R.C. 2743.16(A) is part of Chapter 2743, entitled "Court of Claims State Liability." R.C. 2743.16(A), provides, in relevant part:

[C]ivil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of accrual of the cause of action or within any shorter period that is applicable to similar suits between private parties.

---

[23]In light of our determination that the restitution calculation for class members who were group-rated during part of the class period should include an offset for the subsidy benefits such class members received during the years within the class period in which they were group rated, this may be a case in which subclasses of plaintiffs may be appropriate, e.g., a subclass of employers who were nongroup-rated throughout the class period and a subclass of employers who migrated between group rating and nongroup rating during the class period. We leave that determination to the discretion of the trial court.

**{¶159}** The BWC has not cited a single case, and we are aware of none, in which it has been held that the statute of limitations set forth in R.C. 2743.16(A) applies to claims for equitable relief filed in the court of common pleas.

**{¶160}** Equitable claims were available against the state before the passage of the Court of Claims Act. *See, e.g., Harris v. Grafton Corr. Inst.,* Ct. of Cl. No. 2009-075363-AD, 2010-Ohio-5217, ¶ 10 (acknowledging that "[t]he state consented to be sued for equitable claims prior to the enactment of the Court of Claims Act"). As such, plaintiffs' unjust enrichment claim for equitable restitution is not a claim "permitted by sections 2743.01 to 2743.20 of the Revised Code," and R.C. 2743.16(A) does not apply to plaintiffs' claim. *See* R.C. 2743.16(A); *Simmons v. Ohio Rehab. Servs. Comm.,* 10th Dist. Franklin No. 09AP-1034, 2010-Ohio-1590, ¶ 5 ("The limitation period in R.C. 2743.16 is more specific because it applies only to the limited number of claims that are filed against the state of Ohio, in the Court of Claims. * * * Chapter 2743 of the Revised Code is in fact entitled 'COURT OF CLAIMS,' and is exclusive to practice therein."). Therefore, the trial court did not err in refusing to apply the two-year statute of limitations set forth in R.C. 2743.16(A) to plaintiffs' claim. The BWC's ninth assignment of error is overruled.

## I. Equal Protection

**{¶161}** Turning to plaintiffs' cross-assignments of error, in its first cross-assignment of error, plaintiffs argue that the trial court erred in holding that the

BWC did not violate plaintiffs' right to equal protection under Article I, Section 2 of the Ohio Constitution. We disagree.

{¶162} The Equal Protection Clause "require[s] that individuals be treated in a manner similar to others in like circumstances." *McCrone v. Bank One Corp.,* 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 6. Plaintiffs' equal protection claim is premised on the fact that nongroup-rated employers and group-rated employers in the same manual class were charged different rates based on their group or nongroup status. Plaintiffs contend that, under the Ohio Constitution's Equal Protection Clause, employers in the same occupational classification must be charged workers' compensation premiums using the same rating factors, based on the risk of the occupation, not based on whether they were part of a group.

{¶163} A classification that involves neither a suspect class nor a fundamental right does not violate the Ohio Constitution's Equal Protection Clause if it bears a rational relationship to a legitimate governmental interest. *Menefee v. Queen City Metro,* 49 Ohio St.3d 27, 29, 550 N.E.2d 181 (1990). Because there is no assertion in this case that any suspect class or fundamental right is involved in the classification at issue, the rational relationship test applies.

{¶164} To satisfy the rational relationship test, (1) there must be a legitimate state interest and (2) the means chosen by the state to advance that interest must be rational. *McCrone* at ¶ 9. As the Ohio Supreme Court explained in *State ex rel. Powhatan Mining Co. v. Indus. Comm. of Ohio*, 125 Ohio St. 272, 181 N.E. 99 (1932):

"A classification having some reasonable basis does not offend against [the Equal Protection Clause] merely because it is not made with mathematical nicety, or because in practice it results in some inequality. * * * When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369.

*State ex rel. Powhatan Mining Co.* at 279.

{¶165} In *State ex rel. Powhatan Mining Co.*, *supra*, the Ohio Supreme Court addressed a similar claim of discrimination in considering whether experience rating violated the Equal Protection Clause of the Ohio Constitution. The court held that, even though it resulted in certain employers in a manual classification receiving discounts based on their "individual industrial accident experience" and other employers in the same manual classification with less favorable accident experience paying higher premiums, experience rating did not violate equal protection because the differential treatment of employers in the same manual class was related to the legitimate state interest in "encourag[ing] and stimulat[ing] accident prevention," promoting workplace safety. *Id.* at 278-279. The same conclusion is warranted here.

{¶166} Instead of challenging experience rating at the individual level as was done in *State ex rel. Powhatan Mining Co.*, plaintiffs challenge the constitutionality of experience rating in the group context. The trial court determined that the BWC's differential treatment of group-rated and nongroup-rated employers within the same manual class was rationally related to promoting workplace safety, a legitimate state interest. As the trial court explained:

The group/non-group classifications within the same manual class encourage employers to get into and stay in a group by offering lower premiums to group rated employers. In order to get into a group, the employer must not have claims filed against them, and have maintained a good safety record. Workplace safety is a legitimate government interest, and offering lower premiums to those with a good safety record is relationally related to achieving that interest.

{¶167} The trial court's determination is supported by the record. The rational relationship test is a very low standard. The BWC presented evidence that group-rated employers had 20% lower claims costs than the average employer and that nongroup-rated employers had 30% higher claims costs than the average employer. The BWC also presented evidence, including testimony from several of the named plaintiffs, demonstrating that the discounts provided to group-rated employers under the group rating system created significant incentives for employers to improve or maintain their level of workplace safety because employers needed a favorable safety record to get into and remain in a group. Accordingly, the trial court did not err in ruling against plaintiffs on their equal protection claim. Plaintiffs' first cross-assignment of error is overruled.

## J.  Failure to Include Investment Returns in Restitution Award

{¶168} In their second cross-assignment of error, plaintiffs claim that the trial court erred in failing to include, as part of its restitution award, the value of the investment returns the BWC allegedly earned on the funds it had wrongfully collected from the plaintiff class. Plaintiffs claim that the trial court improperly imposed a "traceability requirement" on plaintiffs' recovery of investment earnings, requiring that

the investment earnings be traceable to the amount of premiums unjustly collected and retained by the BWC. We disagree.

{¶169} The trial court denied plaintiffs' request to recover investment income the BWC had allegedly earned on the excess premiums charged to the plaintiff class as part of its restitution award because it concluded that plaintiffs had failed to present evidence establishing the value of the investment income — if any — that the BWC had actually earned on the overcharged premiums.

{¶170} The Restatement of the Law 3d of Restitution and Unjust Enrichment, Section 53 (2011) — upon which both plaintiffs rely in seeking "disgorgement of the investment returns" allegedly earned by the BWC and the trial court relied in holding that plaintiffs had failed to meet their burden of proving investment income was earned on the excessive premiums charged the plaintiff class — provides in relevant part: "A person who is liable to make restitution of property * * * is liable for supplemental enrichment in the form of interest * * * *to the extent that such further enrichment is * * * realized in fact* * * *."* (Emphasis added.) *See also Sogg v. Zurz*, 192 Ohio App.3d 22, 2011-Ohio-81, 947 N.E.2d 1256, ¶ 11, 13 (interpreting the Ohio Supreme Court's decision in *Sogg v. Zurz*, 121 Ohio St.3d 449, 2009-Ohio-1526, 905 N.E.2d 187, as requiring the Ohio Department of Commerce "to disgorge the interest *actually earned by the state of Ohio, no more and no less*," on unclaimed funds owned by the plaintiff class) (Emphasis added.); *United States v. $277,000 United States Currency*, 69 F.3d 1491,

1498 (9th Cir.1995) (government "must disgorge benefits that it has *actually and calculably received* from an asset that it has been holding improperly") (emphasis added).

{¶171} Upon our review of the record, we cannot say that the trial court erred in denying plaintiffs' request for restitution of investment earnings allegedly earned by the BWC on the premium overcharges. Jeffrey Dahl, plaintiffs' primary witness on the issue of interest, testified that he had no opinion as to whether the BWC had actually earned interest on the premium overcharges to the plaintiff class and could not explain the methodology behind plaintiffs' interest calculation. Schwartz testified that interest on the premium overcharges was calculated by using the investment returns reported in the BWC's financial records for the total state insurance fund. However, as the trial court observed, there was no evidence that the premium overcharges at issue actually generated any of the investment returns reported for the total state insurance fund or that the premium overcharges were invested by the BWC as opposed being used to pay administrative costs or other items such as dividends, discounts, refunds, etc., that may not have been provided but for the excess funds generated by the premium overcharges.

{¶172} Moreover, the trial court had discretion to exclude investment income from the equitable restitution awarded to the plaintiff class based on the sum of the equities and the totality of the circumstances underlying plaintiffs' unjust enrichment claim. Accordingly, plaintiffs' second cross-assignment of error is overruled.

III. **Conclusion**

{¶173} In this case, the BWC violated one of the most basic principles of workers' compensation insurance, i.e., that every employer participating in Ohio's workers' compensation system be charged a reasonable, accurate, and equitable premium rate that corresponds to the risk the employer presents to the workers' compensation system. The record reflects that for more than fifteen years, the BWC ignored the criticisms and recommendations of its actuarial consultants and maintained an unlawful and inequitable rating system under which it knowingly overcharged nongroup-rated employers workers' compensation insurance premiums in order to subsidize massive, undeserved premium discounts for group-rated employers. There were both clear winners and clear losers under the BWC's rating system. The clear winners were group-rated employers and their group sponsors; the clear losers — the nongroup-rated employers.

{¶174} In cases such as this, it is not easy for a court to craft an equitable remedy. A court cannot turn back the clock; it cannot "put the genie back in the bottle"; it has no means by which to "claw back" and redistribute all of the years of undeserved subsidy benefits group sponsors secured for group-rated employers at the expense of those excluded from groups.[24] Both the record and applicable law provide ample support for the trial court's decision to order the BWC, through its restitution award, to refund the

---

[24]For this reason, perhaps the best remedy in this case would have been for the legislature to have more promptly intervened, to have conducted a thorough investigation as to how this situation came about — i.e., was it mere negligence on the part of the BWC or was there some form of collusion between the BWC and group sponsors that resulted in the BWC's implementation of such an inequitable rating program — and to have fashioned a timely and equitable legislative remedy.

premium overcharges the BWC unlawfully and unjustly collected from class members during the class period. Equity, however, demands that, in fashioning an equitable remedy, the court look at the full picture. In this case, that includes accounting for the subsidy benefits class members who were group rated during part of the class period received during the years in which they were group rated. Accordingly, we remand this case to the trial court for recalculation of the portion of the restitution award relating to class members who were group rated during part of the class period. On remand, the trial court should determine the value of the subsidy benefits each migrating class member received during the year(s) within the class period in which the class member was group rated and offset that amount against the total premium overcharges the class member paid during the year(s) within the class period in which the class member was nongroup rated.

{¶175} Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR